SAM'L GOODE, Plaintiff in Error, vs. McQUEEN'S HEIRS, Defendants in Error — Error from Jasper County.

The assent of the federal executive of Mexico was a condition precedent to the right of the state authorities to make grants of land within the limits of what was known as the border and coast leagues; and a grant made by the authorities of the state of Coahuila and Texas, within those limits, is absolutely void, *unless it be shown* that it was made with the approbation of the supreme government. [*Post*, 321, 499; 14 Tex. 146; 16 Tex. 617; 26 Tex. 180.]

The authority to control these lands having been retained by the federal government, no presumption can arise in favor of a grant made by the executive of a state, until it be first shown by proof that the power to make the grant had been conferred upon him.

After the power to make the grant has been shown to exist in the officer who has exercised it, the grant itself carries with it all presumptions in favor of its correctness.

The judiciary had no power, under the constitution of Mexico, or of Coahuila and Texas, to declare acts of the legislature of either government unconstitutional. The power to interpret the constitution resided in the legislative department alone.

The only question presented in this cause is one which came up on a bill of exceptions to the decision of the court in refusing to give certain instructions to the jury. It is fully stated in the opinion of the court.

ARDREY for plaintiff in error.

The form of government established after the overthrow of the Spanish Vice-Royalty in Mexico, was a limited monarchy, in conformity with the Plan of Iguala, and treaty of Cordova, and the Spanish monarchy was provisionally adopted. The executive department of the government was administered by a regency, of which the Generallissimo Don Augustin Iturbide was president. The government went into operation on the 24th February, 1821. By this revolution and the establishment of a new government, the patrimonial right of the King of Spain passed to the new government. [1 White's Recopalacion, p. 565.] On the 19th of May, 1822, the provisional congress was turned out of doors, and Iturbide was proclaimed emperor of Mexico, and the imperial government continued until the 29th May, 1823. [1 White, 570.] The institutent congress

16

then provisionally organized a government, and published the same on the 4th of October, 1824. [1 White, p. 410.] The supreme executive power provisionally appointed by the general sovereign constituent congress [Decree No. 72] on the 18th August, 1824, passed a national colonization law, which offered to foreigners who should come to establish themselves within the territories of the Mexican nation, security for their persons and property; and to carry out this measure of public policy, it provided that the lands of the nation could be colonized. [Art. 2, Nat. Col. Law, 1 White, p. 601.] For the purpose of accomplishing this measure of public policy, this national colonization law required of the states composing the Mexican Confederation, that the legislatures thereof should, as soon as possible, *form colonization laws; subject to such provisions as had been adopted on the subject of colonization, to the constitutive act, general constitution, and the regulations of that law.* [Art. 3, Col. Law, 1824, p. 601.]

This national colonization law, in the 4th section, prohibited the colonization of any lands comprehended within twenty leagues of the limits of any foreign nation, or within ten leagues of the coast, without the previous approbation of the general supreme executive power; and the 5th section of the same law gives us the reason why this prohibition was made.

At this time, the power of sovereignty was vested in the general sovereign constituent congress; and it, in the distribution of the powers and rights of sovereignty in the organization of the new government, prohibited the colonization of any lands within the border leagues, except with the assent of the supreme executive power. The right to colonize depended upon that assent of the supreme executive power, which is evidence of the right of domain in that power.

The state of Coahuila and Texas, by its constituent congress, on the 24th March, 1825 [Decree No. 16], reciting the powers thus conferred (and submitting to them) by the Decree No. 72 of the general supreme instituent congress, decreed the colonization law of that date, and provided in detail for carrying out the provisions of the national colonization law. In article 7 of

that law, the executive of the state is charged to take care that within twenty frontier leagues bordering on the United States line, and ten littoral leagues upon the coast of the Gulf of Mexico, within the limits of the state, no other settlements shall be made than such as shall meet the approbation of the executive of the union; to whom all future petitions on the subject, accompanied by the corresponding report, shall be transmitted. [Art. 7, Laws Coahuila and Texas, p. 16.] Thus recognizing that any colonization settlement upon the border leagues, without the assent expressed, was a nullity; and a right and permission to occupy them without it was contrary to law. This assent was necessary to acquire a title, and is certainly evidence of the right of domain in the general government of Mexico to this particular country. There is no law that can be found, where any state or officer is permitted to give that assent; and the act of the state, or any of its officers, permitting a settlement thereon, was contrary to law, and void. It has been contended that the words "no other settlements," as used (the Art. 7th), mean empressa contracts. Such could not have been the intention of the legislature; for, in the Art. 11 of the colonization law of the state of Tamaulipas, the words used therein are, "no town projected by foreigners." [Laws C. and T. p. 345.] We think, then, with regard to this portion of the charge asked, that the court erred, and that the jury was misguided in their finding by this charge.

The next portion of the charge asked and refused was, "that the consent of the federal executive must be proved by the plaintiff, in order to show title in himself from the government." This, then, leads us into an investigation of the details of the process of procuring a title to a portion of the public domain, under the laws of Mexico, with regard to colonization.

The colonization law of Coahuila and Texas, March 24, 1825, art. 4, provides "that any foreigner, from the time that he becomes domicilated, shall be permitted to specify any vacant land; and it shall be the duty of the respective political authorities to forward the instrument that shall be drawn, to the executive *for his approval*, should he consider the appli-

cant the same as natives of the country, *conforming to the existing laws on the subject.* [Art. 4, Laws C. and T. p. 16.]

After arrival of foreigners, they must present themselves to the ayuntamiento of the place he shall select as his place of residence; by which he shall be sworn to obey the federal and state constitutions, and to observe the religion prescribed in the former; and his name, and those of his family, shall be registered in a book to be kept for that purpose; and then, under the *naturalization laws of the government, he is considered as a native.* The political chief of department is the sole channel of communication between the ayuntamiento and the government. [Decree No. 13, Instituent Congress, p. 13, sec. 15.]

The political chief shall take care that no person in his department shall appropriate to himself any lands. [Decree No. 13, Instituent Congress, art. 9, p. 12.]

All future petitions on the subject of making settlements upon the twenty border leagues, accompanied by a corresponding report from the governor of the state, shall be transmitted. [Art. 7, Col. Laws C. and T. p. 16. *Vide* Austin's petition to the president of Mexico on June 5, 1826, for settling the reserve land on the coast, between La Baca and San Jacinto, 1 White, p. 614; the opinion of the state governor, making the corresponding report required by the 7th Art. Col. Laws C. and T. id. 615; approbation of the president, id. 615; representation of Austin to the governor, showing and manifesting the consent of the supreme executive of the union, 1 White, 616; contract of the governor and Austin, and Austin's commission.]

All families established in the state *without having assigned them lands* shall conform to the colonization law, and to what the executive of the union shall direct, with respect to those who are within the twenty border leagues of the line of the United States of the North, and ten border leagues of the coast of the Gulf of Mexico. [Art. 47, Col. Law C. and T. p. 22.]

The commissioner shall not give possession to any colonist settled, or intending to settle, within the twenty border leagues of the United States of the North, and the ten littoral leagues

of the Gulf of Mexico, unless the person interested shall present him a special order from the government, wherein the approbation of the national government thereof shall be manifested. [Art. 5, Executive Instructions to Commissioners, September 4, 1827, p. 71.]

The commissioner is required to form a book in calf, wherein he shall write the titles of the lands which he distributes to the colonists; specifying their names, the boundaries, and other requisites and legal circumstances; and he shall take from said book attested copies of each possession upon paper of the second seal, which he shall deliver to the person interested, to serve him for a title. [Art. 8, Instructions, p. 71.]

Families that shall arrive comformably to the 16th article shall present themselves forthwith to the political authority of the settlement they shall have selected, who, recognizing on their part the necessary conditions required by this law, shall admit the same, put them in possession of the lands to which they are entitled, and give notice immediately to the executive, that the same of himself, or through persons he shall commission for that purpose, may issue them their titles. [Art. 18, Col. Laws C. and T. p. 18.]

From these authorities, then, I think that it is shown "that the consent of the federal executive must be proved by the plaintiff, in order to show title in himself, from the government;" and that the court clearly erred in refusing the said charge asked by the defendant.

This assent of the executive of the federal union not being expressed on the face of the plaintiff's title, and not having been proved to the jury, the plaintiffs did not show such a title as entitled them to the verdict of the jury — it appearing, from the statement of facts, that it was proved before them that the land claimed was situated within the twenty border leagues.

It may, however, be contended that as the governor of the state of Coahuila and Texas has made the grant, and that by the law he could only do it with the assent of the federal executive, that that assent will be presumed, or that the governor's grant is presumptive evidence that the assent was first had;

and that that presumption will be indulged in until it is rebutted by the defendant.

This position I do not think is tenable as a rule of evidence, and will be found not to apply to the case in question upon inspection of the authorities. It is true that a grant will be presumed to support a long continued possession, even against the government, if the government were capable of making the grant. [1 Phillips' Evidence, p. 161.]

The plaintiff must recover upon the strength of his own title; and he alleges title to the land by virtue of a grant. Can he produce the grant which is direct proof of title? If he cannot, then his long continued possession of the premises is evidence of a grant. A presumption is only an inference of the existence of a fact, from its usual and known connection with, and relation to, another fact which is capable of direct and positive proof, and which is directly proven; but when the fact presumed is capable of positive and direct proof, then the presumptive proof ceases, and is inadmissible, because there is better evidence of the fact. [*Ibid.* 161.] A grant is presumed when there is no direct and positive proof capable of proving it, and it may be inferred from the fact of long continued possession; but if the grant can be produced, then that is better evidence of the grant than long continued possession. Direct evidence of a fact is of much higher weight than presumptive evidence of that fact. [1 Phillips' Ev. p. 167; Greenleaf on Evidence, sec. 20, p. 80.]

The next error which the record presents is the refusal of the judge to make the charge requested by the defendant. "That the plaintiff, by not demurring, or by amending by filing a supplemental petition, stating some new matter of fact, to avoid the defendant's plea of title in himself, has admitted that the facts of the defendant's plea, if proven, are a sufficient bar; and if defendant proves them to be true, that the defendant is entitled to a verdict."

From the pleadings in the cause, it will be seen that there was no exception to the sufficiency of the defendant's answer made by the plaintiff before the trial of the cause; and this

court has said, that if exceptions to the pleadings are not taken in the court below, they are deemed to have been waived. [Mimms vs. Mitchell, 1 vol. Texas Reports, p. 443.] The effect, then, of the waiver of the exception, is clearly an admission on the part of the plaintiff, of the legal sufficiency of the defendant's answer. It is certainly not the business of the court to determine questions of law which the parties do not present by their pleadings, and in which they do not invoke the judgment of the court. Each party has the right, and it is his duty, of presenting his case as he may think proper, if he pursues the course of judicial proceeding; and he may, by his own manner, present his case before that department of the court which can dispose of the questions which he may think proper to present. If the party choose to present a question of law to the judge, he is bound to decide it; and he cannot be compelled to decide questions of disputed fact; nor can the jury, when a disputed question of fact is, by the parties, referred to them, refuse to decide it, and present it for decision to the other department of the court. These propositions, if true, show that the prosecution or defense of a cause depends upon the parties' pleadings. There must be either a disputed question of law, or of fact, presented by the parties, to invoke the action of the court. The 3d section of the act regulating proceedings in district courts, approved 13th May, 1846 [p. 365], provides that all civil suits in the district court shall be commenced by petition filed in the office of the clerk of the district court. The 29th section of the same act [p. 371] provides " that the defendant in his answer may plead as many several matters, whether of law or fact, as he shall think necessary for his defense, and which may be pertinent to his cause." I think, under this section, that the defendant must present in his defense a question of law or of fact, which is pertinent. The question of law is always whether, admitting the facts stated by the plaintiff to be true, he is entitled to the judgment of the court. The matters of fact presented, are, 1st, either a general or special denial of the truth of all, or some material facts which the plaintiff is required to state in order to show a cause of ac-

tion; or, 2d, the statement of new special matter, which (admitting all the plaintiff's material facts to be true) show that he is not entitled to the judgment of the court. This, then, is what is denominated in the civil law the *contestatio litis*, and *issue* by the common law. If, under this condition, the cause was required to be submitted to the action of the court, the plaintiff would certainly be, or might be, taken at advantage or by surprise; and he would have his case presented without the privilege of having the sufficiency of the defendant's answer determined, or the opportunity of denying the truth of the facts alleged, or stating such new matter as may still show that he is entitled to maintain his suit. It has been determined in this court, in the case of Parrot *vs*. Underwood, that all the facts in the plaintiff's petition, not denied, are admitted; and that if the defendant does not except to the legal sufficiency of the plaintiff's action as stated by him, that it is a waiver to have the case tried here upon all questions which are not *stricti juris;* which I regard, in effect, as recognizing the common law rule, that, if the pleadings are not demurred to, that they are admitted as sufficient in law. I think that the same principles are applicable to the pleadings subsequent to the petition as much as to that. If the legal sufficiency of the facts in the defendant's answer is not controverted, denied, or confessed and avoided, and are proved to be true by the evidence, then the defendant should have judgment. There never can be any consistency in the proceedings of courts of justice until such principles are recognized and established, and there certainly is nothing in our statutes which prohibit it; and if such be not the law, this court ought to establish a rule of practice to that effect.

KAUFMAN for defendants in error.

[No brief furnished the reporters.]

Mr. Justice LIPSCOMB delivered the opinion of the court; Judge WHEELER not sitting, having been of counsel below.

This was an action by the heirs of David McQueen, to try titles for a league of land alleged to have been granted to their

father, David McQueen, by the executive of the state of Coahuila and Texas, on the 20th of September, 1828.

The defense set up was, not guilty of the trespass; 2d, title in himself; 3d, that the plaintiffs were barred from their action by not having brought their suit against the republic, under the border league statute for quieting titles to lands within the border leagues, within the time prescribed by that statute.

It appears, from the statement of the facts, that the land sued for lies within twenty border leagues of the old boundary line between Mexico and the United States of the North.

It was in proof that David McQueen lived on the land, and cultivated some six or eight acres in corn, from 1828 until 1831; that he then left for the United States of the North, but, on leaving, declared his intention of returning, but never returned, and has been generally reported to be dead; that his wife remained on the land until 1833, when she left.

It is not plainly shown by the evidence where she went, or whether she abandoned the country at that time; but it is plainly inferable from the evidence that she went to the United States; that she died about four years before the trial in the court below, having never returned.

The defendant in the court below, who is the plaintiff in error in this court, had been in possession under a certificate of a headright granted to him in 1838, recommended by the local and traveling board as genuine, and located and surveyed by the county surveyor of Jasper county.

On the trial, as appears by the bill of exceptions, the defendant's counsel asked the judge to charge the jury, that, by virtue of the colonization law of the general congress of the republic of Mexico, of the 18th of August, 1824, the right of domain within the twenty border leagues of the United States line was reserved to the republic of Mexico; and that the public domain within the limits thereof could not be granted, except under the laws passed for the disposition of that domain; and that, by the colonization laws of Coahuila and Texas, passed under the authority of the constitution of the general government of Mexico, the state of Coahuila and Texas had no

authority to grant the same; and that the consent of the federal executive must be proved by the plaintiffs, in order to show title in themselves from the government.

This charge was refused by the judge. There was a verdict and judgment for the plaintiffs; to reverse which the defendant has brought a writ of error to this court.

The whole case rests mainly on the validity of the grant on which the suit was brought. Let us, then, inquire if the grant conveyed a legal title to the grantee. The first objection is, that it was void for want of any authority of law in the grantor to grant land within the twenty border leagues of the old boundary between the United States of the North and Mexico.

In the investigation of the powers of the executive of the state of Coahuila and Texas to grant lands, it will be necessary to review the acts of the federal and state governments in relation to their public lands. It is not important, in the case under consideration, to inquire into the mode of obtaining title to a part of the public domain, prior to the organization of the Mexican republic. The first colonization law was promulgated during the short reign of the Emperor Augustin, and it bears date the 4th of January, 1823. We are not aware of any contract having been made under this law, excepting Austin's first contract, dated 18th of February, 1823.

In the imperial colonization law, no limitation or inhibition is imposed against border grants. Very soon after this the emperor was overthrown, and the constituent congress of Mexico was organized. By this congress, Austin's contract with the emperor's government was ratified, in consideration, it is said in the act of ratification, of its having been in conformity with the colonization law passed by the Junta Nacional Instituente, at the head of which, it will be remembered, was the emperor; thus recognizing the laws passed by the previous government. The constituent congress, however, suspended the colonization law until there could be a new resolution on the subject. The decree of the supreme executive power ratifying Austin's contract was issued on the 14th of April, 1823. By decree 72 of the 18th of August, 1824, the general sovereign

constituent congress passed another national colonization law. The first section of this act holds out an invitation to foreigners within the territory of the republic. The second section declares that this law comprehends those lands of the nation (not the property of individuals, corporations or towns) which can be colonized. The 3d section is in the following words, that is to say: "For this purpose, the legislatures of all the states will, as soon as possible, form colonization laws or regulations for their respective states; conforming themselves in all things to the constituent act, general constitution, and the regulations established in this law." Article 4th provides: "There cannot be colonized any lands comprehended within twenty leagues of any foreign nation, nor within ten leagues of the coast, without the previous approbation of the general supreme executive power."

We are hardly left to conjecture as to the policy or motive that dictated this inhibition. The federal party, having gained the ascendency and overthrown centralism, were laying down the programme of a federal republic composed of the several different states, and each of these states to be independent of the federal government so far as related to their internal polity; the federal government to be charged with peace or war, and everything connected with foreign relations and intercourse with other nations. It is natural that some fears and doubts might exist, whether the state sovereignties would be strong enough to enforce good order if their settlements should so approach as to mingle in neighborhood the citizens of two distinct nations. It was feared that collisions would arise to endanger the peace of the nation, arising from a difference in interest, habits, manners, language and religion. The wisdom of this policy, if it had been rigidly enforced, has been verified by the history of the country. At any rate, it cannot be doubted that it was designed as a measure of state policy, which the government had the right to adopt. In accordance with this act of the constituent congress, the congress of the state of Coahuila and Texas, by decree No. 16 of the 24th of March, 1825, passed a state colonization law, in the caption of which

it is declared that "The constituted congress of the state of Coahuila and Texas, desiring, by every possible means, to augment the settlement of the territory, to advance the raising and increase of stock, and the progress of the arts and commerce, in conformity to the constitutive act, the constitution of the republic, and the basis established by decree No. 72 of the general congress, has thought proper to decree the following colonization law." The 7th section shows that the legislature of the state was not unmindful of the restriction that had been imposed. It is as follows: "The executive shall take care that within twenty frontier leagues bordering on the United States' line, and ten littoral leagues upon the coast of the Gulf of Mexico, within the limits of the state, no other settlement shall be made than such as shall meet the approbation of the executive of the union, to whom all future petitions on the subject, accompanied by a corresponding report, shall be transmitted." Again, in the 47th article, all families established in the state, without having land legally assigned them, shall conform to the said law, and to what the executive of the union shall direct, with respect to those who are within the twenty border leagues of the line of the United States of the North and ten leagues of the shore upon the Gulf of Mexico.

The same inhibition is found in the instructions given by the executive to the commissioners. The same will be found, also, in the colonization law of Tamaulipas [see article 11, Col. Law Tam.], with the modification that no foreigners shall be settled.

It appears that from the promulgation of the law 72 of the constituent congress, no grant has been made without a strict compliance with the requisitions of that act. Of course Austin's first colony is an exception; because his contract, being first made with the emperor's government, was afterwards confirmed by the executive of the general government without any modification. It had all the requisites afterwards exacted by the new colonization law; therefore the inhibition cannot affect the grants of those who may have received them, although the land may be within the ten littoral leagues of the gulf shore. But when he proposed to colonize other families on the littoral

leagues, his propositions were made, through the executive of the state, to the executive of the union; and his approbation was affirmatively shown before the execution of his contract with the state executive. His contract with the state executive shows on its face that the requisitions of the general colonization law had been strictly complied with, and that it had received the approbation of the federal executive. This is a practical illustration of the construction given at that time, not only of the law, but also of the forms required to be observed in obtaining rights under it, and is entitled to great consideration because of its occurrence so soon after the establishment of the system. [See White's Recop. vol. 1, p. 616, and the archives of the General Land Office.]

It is not necessary here to inquire whether the restriction imposed on the granting power of the state by the general government was the exercise of a rightful authority or not, because at the time the grant, in the case before us, was made, it was equally repugnant to the law of the state and the general government to make it without the approbation of the supreme executive of the republic. [See Col. Laws above cited.]

It may, perhaps, be thought that, on the authority of the supreme court of the United States, in the cases of Arredondo, Clark, Mitchell and Perchman, this court ought to presume that the approbation of the federal executive had been obtained. The opinions of the late Chief Justice MARSHALL, and the decisions of the court over which he presided, will, at all times, command great respect; and, in cases directly in point, will be generally received as conclusive. But on an examination of those cases, in which the doctrine of presumption of authority has been allowed to exert so much influence, a plain and manifest distinction will be observed between them and the case now before us. The rule of presumption will be found in those cases to have forced itself upon the court, as, from the peculiar circumstances, it was the best evidence that could be procured. To have rejected the rule would have been destructive of rights, supported by evidence, that usage had established as sufficient. The grants in the Florida and Louisiana cases

issued from an absolute sovereign, and were not regulated by any settled rules of law. On this subject, Mr. Justice BALDWIN, in Arredondo's case [6 Peters, 714], uses this language: "The laws of an absolute monarchy are not its legislative act; they are the will and pleasure of the monarch, expressed in various ways — if expressed in *any*, it is a law. There is no other law-making, law-repealing power. Call it by whatever name — a royal order, an ordinance, a cedula, a decree of council, or an act of an authorized officer — if made or promulgated by the king, by his consent or authority, it becomes, as to the persons or subject matter to which it relates, a law of the kingdom. It is emphatically so in Spain and all its dominions. Such, too, is the law of a Spanish province conquered by England. The instructions of the king to his governors are the supreme law of the conquered colony. Magna Charta, still less the common law, does not extend its principles to it. The laws of the Indies have not their force as such by any legislative authority vested in the council; their authority is by the express or implied expression of the royal will and pleasure; they must necessarily yield to an order prescribing a new rule, conferring new powers, abrogating or modifying previous ones." And, again, he says: "The principle that the acts of a king are in *subordination* to the law of the country applies only where there is *any law of higher obligation* than his will. The rule contended for may prevail in a *British*, certainly not in a *Spanish*, province."

Such being the source from which all grants in Florida for the public lands emanated, it is obvious that the courts were bound to presume that the person who was representing his sovereign's will and pleasure was not transcending the authority delegated to him. The sovereign was bound by no particular form or ceremony in the delegation of the authority, and no one had the right to question it. Presumption in such cases was the best evidence of the fact of authority that could in general be obtained. You could not say to the agent, you are acting on a different rule than heretofore, because the instructions of his sovereign may have been modified; and he may well say,

I know no law but the will of my sovereign. The difference in the granting power, in the case before us, is so manifest that it would be an act of supererogation to offer anything in the shape of argument in illustration of it. The grant does not depend upon the expression of the will of a king: it is regulated by *law* — not subject to be abrogated or modified at the pleasure of any individual. The general government of Mexico, it has been seen, retained the control of the public domain within the border leagues. It was a measure of public policy, appertaining to the federal government, not to be dispensed with only by the previous approbation of the federal executive. It was not a mere negative control, or limitation on the states; but in order to make valid a grant by the state, it is clear, from the terms used, and from the early practice under the system, that it should be preceded, in conformity with law, by the affirmatory act of approbation from the federal executive. This was the most important fact to be shown, because the power remained with the federal executive; until that approbation was obtained, the state executive was powerless. This being shown, the manner in which the state executive then issued the grant would be presumed to be in accordance with law. If he acted without the approbation of the federal executive, his act was not merely voidable, but it was void. This would come within the rule laid down by the supreme court in the same case above cited, p. 728. Mr. Justice Baldwin says: "*It is true, that a grant made without authority is void under all governments;*" and he refers to 9 Cranch, 99; 5 Wheat. 303. It is admitted that the burthen of proof of a want of power would rest on the party impugning it; and if the grant proceeded from an absolute monarch through his agent, if it had the customary form, and was issued *by the agent of the sovereignty*, it would be conclusive in favor of the power. Not so, however, where its issuance was regulated by acts of the legislature of the people. If it can be shown by such laws that the person assuming to grant has no power, and this being shown by the application of the law to the power claimed, if the law does not give the power, the grant is void.

In Polk's Lessee *vs.* Wendell, the court laid down this general principle: "But there are cases in which a grant is absolutely void; as where the state has no title to the thing granted, or where *the officer had no authority to issue the grant.*" Now, this is precisely the case with the grant under consideration. The executive of the state had no authority to make the grant. The case of Mason *vs.* Russel's Heirs [1 vol. Tex. R.] was believed to be within the same rule — *a want of power in the grantor.*

There can be no question but that many things ought to be presumed in favor of a grant after the power to make it is established in the grantor; this being the most essential, its subsequent conformity to law will, in many cases, be presumed to be correct, without any other proof than the grant. At the date of the grant to the ancestor of the plaintiffs in the court below, the congress had never assumed to act on the domain within the border leagues, in any other way than in strict conformity with the colonization law passed by the constituent congress of the republic. Had the congress of the state passed a law for the settlement of this land on the border, and authorized its executive to have granted the same to new settlers, it might have been well questioned whether the judicial tribunals of the state could have adjudicated such act to be unconstitutional and void, on the ground of its repugnancy to the federal constitution. It would have presented a case of conflict between the political authority of the state and federal governments; and it might have been insisted that it would have to be settled between them, and was beyond the control of the judicial tribunals to say that the state legislature had transcended its powers.

The question may seem strange and preposterous to those who have been accustomed to see the uniform and harmonious action of the different departments of the government, under the constitution of the United States and the several states composing the union; and the proposition, that the judiciary had not the authority to declare an act of the legislature void for its repugnance to the constitution, would seem to involve a most manifest absurdity.

It will, however, be borne in mind, that in all popular governments the constitution embodies the will of the people, and their will is spoken through that instrument; and if the people have thought it inexpedient to repose such power in the judicial department, but to deposit it elsewhere, their will cannot be gainsayed. Both the constitution of the republic, and of the state of Coahuila and Texas, seem to have reserved this power to the legislative department. Article 165 of the federal constitution is as follows, viz.: "Congress alone has the right to interpret the constitution in doubtful cases."

In the 97th article of the state constitution, in the enumeration of the powers of congress will be found the following: "To enact, *interpret*, amend or repeal the laws relative to the administration and internal government of the state, in all its branches;" and, in the article 172, it is directed that "the tribunals and courts of justice, being authorized solely for applying the law, *shall never interpret the same*, nor suspend their execution."

These extracts would seem to be conclusive whenever the power of the legislature to pass the act was the question.

This peculiarity in the federal constitution of Mexico, and the constitution of the state of Coahuila and Texas, has been long known, and is no new discovery of modern research, drawn from the obscurity in which a different language from our own had allowed it to repose. Near ten years ago, in a conversation on the subject of the constitution of Mexico, in which a Mexican gentleman, who enjoys considerable reputation among his countrymen as a jurist, participated, he expressed much surprise at what he thought an anomoly in the constitution of Texas, that it was the *faculty of the judiciary to construe, and decide on, the constitutionality of acts of congress*. He was opposed to it in principle, and believed that the constitution of Mexico had wisely guarded against it.

I have no doubt that, in the courts of Mexico, the judicial tribunals would not possess authority to say that any act of the legislature was unconstitutional and void.

If, then, there had been an act of the state legislature that gave a right of property to the grantee, without reference to the approbation of the federal executive, it forming a rule of property, I would not feel myself authorized to say that it was void because repugnant to the general colonization law of the republic. It not being repugnant to our constitution of the republic of Texas, nor inconsistent with our present institutions, I would not feel myself authorized to withhold the benefit of the act of the legislature of Coahuila and Texas from the plaintiffs below, if it would sustain the grant under which they claim title, and the same has not been forfeited by abandonment, if the plaintiff below showed that there was no impediment to their holding title so derived. There can be no doubt that the acts of the congress of the state of Coahuila and Texas, so far as they are applicable to contracts executed and completed, and to rights consummated, derived from the former government by those who were citizens of Texas at the date of the declaration of independence, must, in general, be regarded as the law of property; and that any supposed repugnancy of the acts of congress to the state constitution, or to the constitution of the republic of Mexico, cannot be considered; that they are still in force, unless they have been abrogated and annulled by the constitution of the republic of Texas; or are otherwise repugnant to, and incompatible with, the laws and institutions of the new government. [See section 1 of Schedule of Const. of the Republic.]

There may, possibly, an exception arise, in case of an act retrospective in its effect. In such cases we may, perhaps, be authorized to sustain acts of parties, and rights acquired, before the passage of the act. Because it might well be supposed that congress did not intend that such rights should be affected by the act; and it was the usual practice with the congress, when an act was repealed by them, on the ground of its want of conformity to the constitution, to make valid, acts done under it before its repeal. Let us, then, inquire if any such act of the legislature does exist. We have before said, that, up to the date of the deed in the case before us, there had

been no legislative action asserting a right to control the vacant land reserved on the border, only in conformity to the general colonization law of the republic.

A law of the congress of Coahuila and Texas was passed on the 26th of March, 1834, p. 251, in which article 32 is as follows, that is to say: "To the inhabitants of the frontier of Nacogdoches, and those residing east of Austin's colonies, titles shall be issued to the lands *they occupy*, according to article 16 of the colonization law of the 24th of March, 1825, and the resolutions of the general government of April and August, 1828; and the executive shall appoint one or two commissioners for that object, who, without delay, shall execute the same at the expense of the persons interested; and the titles heretofore legally issued are hereby confirmed." I have had some difficulty in arriving at a satisfactory construction of this law. I am not prepared to say that the congress meant by it, to extend titles to all who were settled on vacant land, at that time, within the border leagues; or, that only those who were not within the reserved limits should have titles. If such was the object, why any reference to the resolutions of the general government? These resolutions are not before us. If they were, perhaps some light might thereby be thrown on this seeming obscurity. There is, however, no necessity for deciding on titles issued under this law, at present, as the title we have under consideration was issued long before the passage of the law of 1834. If this law can be of any assistance to the deed of the McQueens, it will be derived from the last part of it, "and the titles heretofore legally issued are hereby confirmed." What class of titles is referred to in this part of the law? Is it to old titles, derived from the royal government of Spain? or does it refer to titles to settlers under contracts with empressarios? I would incline to believe that it was to these last, who may have received titles supposed to be legal, and, perhaps, were so; and the act of confirmation was merely to give them better assurance. It could not mean a title manifestly contrary to law, when it was issued like the one sued on in this case. The first part of the law embraces a class known by the history

of the country. Many of them had emigrated to Texas as in-
tended colonists of Austin's first colony; but in consequence of
his long detention in Mexico, they became dissatisfied, and set-
tled on the Ayish bayou. These constituted the principal part
of those intended to be embraced by the description of the
" *inhabitants of the frontier of Nacogdoches.*"

It is very clear, that whatever other obscurities there may be
in the law referred to, that its benefits were designed for those
only who, at the time, occupied the lands for which they were
to receive titles. The statement of facts shows that the land
embraced in the grant to David McQueen had been abandoned,
first by McQueen in 1831, with a declaration that he intended
to return; but that he never did return, and that his family
abandoned in 1833, and that they were in Mississippi or Ala-
bama. The time of McQueen's death is not shown, but it is
fairly to be inferred that it was not until some time after his
leaving Texas. His widow, who left for the United States in
1833, died about four years before the suit was tried. It must,
therefore, have occurred about 1843, as the suit was tried in
1847.

The archives of the land office show that title was granted
to the settlers on the frontier of Nacogdoches, under the law
of 1834. Such titles, when granted to occupants, could scarcely
be questioned at this time, whether the resolutions referred to
in the law approved of them or not, for the reasons we have
shown above. But the grant, in the case before us, was not
issued under that law, nor could it have been ratified by it, be-
cause the statement of facts shows that the whole family had
ceased to occupy the land at that date. And even if the grant
had been valid when issued, it became absolutely void by a
total abandonment of the country. [See Heirs of Holliman
vs. Peebles, 1 vol. Texas Reps.]

Inasmuch, however, as there was no motion for a new trial,
because the verdict was contrary to evidence, we cannot notice
the error arising from the fact of the deed going to the jury as
evidence of title. But the court erred in refusing to charge
the jury that, to make the grant good and valid, it should have

been shown that is was issued with the approbation of the executive of the general government; for which error the judgment must be reversed, and the cause remanded.