## UNITED STATES *v.* COE.

.APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 8. . Argued March 14, 15, 1898. — Decided May 23, 1898.

After a careful examination of all the acts of the Mexican authorities upon which the appellee claims that his title to the grant in question in this case is founded, the court arrives at the conclusion that the officers who made the grant had no power to make it; and the decree of the Court of Private Land Claims establishing it is reversed, and the case is remanded for further proceedings.

THIS suit was originally instituted February 2, 1892, by the Algodones Land Company, under provisions of an act entitled "An act to establish a Court of Private Land Claims and to provide for the settlement of private land claims in certain States and Territories," approved March 3, 1891, c. 539, 26 Stat. 854.

Pending the litigation, the Algodones Land Company conveyed the property to Earl B. Coe, and upon motion the action was revived in his name.

The basis of the claim is an alleged grant, which shows: That one Fernando Rodriguez, on January 4, 1838, at Hermosillo, presented a petition to the treasurer general of the state of Sonora, Mexico, stating that he had sufficient means to settle and cultivate a tract of vacant desert land, on the northern frontier of the state, situated between the Colorado and Gila rivers, said lands including the tract from the southern side of the Gila River, in front of the junction of the same with the Colorado River, as far as the crossing (paso) of the Algodones,

and from said point following the eastern margin of the Colorado River as far as the junction of the same with the Gila, a distance of five leagues.

"Wherefore, in the name of the sovereign authority of the state," he formally registered the same and asked that a person be appointed to make the measurements and valuation and the necessary publications, "as required by law.".

He also offered at the proper time to furnish satisfactory evidence as to his ability to pay the just taxes (derecho) into the public treasury —

"It being understood, señor treasurer, that the registry that I now make is under the condition that the settlement and occupation of the said vacant lands by me shall be when the notorious condition and circumstances of the region of the country in which said lands are situated may permit the same to be done; since the said vacant lands are situated in a country desert and uninhabitable on account of the hostility of savages; it being well known that a settlement made by the Spanish government in the desert country of Colorado was entirely destroyed in a short time by the Yuma Indians and other savages, etc."

Thereupon a commissioner was appointed by the treasurer general, who was directed to ascertain whether the grant would conflict with the rights of any other parties; also to survey and appraise the lands and offer the same for sale under the provisions of certain designated laws of the state.

This commissioner, in the performance of the duties assigned him, caused the land to be appraised and surveyed, and thereafter offered the same for sale at public outcry on each day for thirty consecutive days.

In his petition Rodriguez offered to pay for the land the amount at which it should be appraised, and no other person having bid at any of the public offers, the record of the proceedings was returned to the treasurer general for final action. That officer thereupon referred the matter to the promoter fiscal of the public treasury, who upon a review of the proceedings, declared that Rodriguez ought to be admitted to a composition with the treasury of the state for said lands, and

recommended that three public offers be made, closing his report with the following language:

"This is the report of the undersigned fiscal. Your honor (the treasurer general) will do what is proper in the premises."

The treasurer general thereupon ordered that three public offers of sale be made of said lands in the manner established by law. The "junta de almoneda," or board of sale, thereupon proceeded to make three public offers of sale on consecutive days, and on the third offer declared Rodriguez to be the purchaser.

Thereafter the treasurer general executed a formal instrument in writing, in which, after referring to the proceedings thereto had, he recites as follows:

"Wherefore in the exercise of the faculties conceded to me by the laws, decrees and regulations and the superior existing orders in relation to lands, by these presents, and in the name of the free, independent sovereign state of Sonora, as well as that of the august Mexican nation, I concede and confer upon, in due form of law, the Señor Don Fernando Rodriguez, . . .

"The five square leagues, and adjudicate the same to him under the conditions which have been admitted as equitable and just by interested party, the Señor Don Fernando Rodriguez, that is, that he shall settle and cultivate said lands so soon as the circumstances surrounding that distant and desert portion of the state may permit him to do so, in view of the imminent risk and danger there is on account of the savages, but when the said lands shall once be settled and cultivated, they shall be kept in condition, and that they shall not be unoccupied and abandoned for any time; and if the same shall be abandoned for the space of three consecutive years, and any one else denounce said lands, in that event, after the necessary proceedings, they shall be adjudicated anew to the highest bidder; excepting as is just, those years in which the abandonment was occasioned by the invasion of the enemies, and this only for the time that this condition of things exists," etc.

The "junta de almoneda," or board of sale, consisted of

certain officers, among whom was the treasurer general. The powers of the board with reference to the sale of public lands were conferred and defined by the laws of the central Mexican government.

*Mr. Matthew G. Reynolds*, special assistant to the Attorney General for appellant. *Mr. Solicitor General* was on his brief.

*Mr. A. M. Stevenson* for appellee. *Mr. S. L. Carpenter* and *Mr. Frederick Hall* were on his brief.

Mr. Justice McKenna, after stating the case, delivered the opinion of the court.

We shall assume the genuineness of the title papers. It was so found by all the judges of the court below and, notwithstanding some irregularities in them, we are disposed to concur in the finding. The question which remains is, did the officers who made the grant have the power to do so?

Section 4 of the act establishing the Court of Private Land Claims provides that the petition of petitioners "shall set forth fully the nature of their claims to the lands, and particularly state the date and form of the grant, concession, warrant or order of survey under which they claim, by whom made, . . . and pray in such petition that the validity of such title or claim may be inquired into and decided."

In conformity to the act the petition in this case, after alleging ownership of the land, proceeds as follows:

"Your petitioner further represents that it owns, holds and possesses said land under and by virtue of a certain instrument of writing, now and hereafter designated as a grant title, bearing date the 12th day of April, 1838, duly made and executed by and on behalf of the state of Sonora, in the republic of Mexico, under and by virtue of article two (2) of the sovereign decree, number seventy (70) of the 4th of August, 1824, therein conceding to the state the revenues

(rentas) which by said law are not reserved to the general government, one of which is the vacant land in the respective districts pertaining to the same; and thereunder the honorable constituent congress of Sonora and Sinaloa passed a law, being a law numbered thirty (30), bearing date 20th of May, 1825, and whereunder there was subsequent legislation passing other decrees, considering the same matter, and being embodied in sections 3, 4, 5, 6 and 7 of chapter ninety of the organic law of the treasury, being law numbered twenty-six (26) of the second of July, 1834."

The source of the title is therefore alleged to be in the state of Sonora, and the basis of its authority is explicitly given.

(1.) Article two of the sovereign decree number seventy of the 4th of August, 1824.

(2.) A law passed by the constituent congress of Sonora and Sinaloa, being number thirty and bearing date 20th of May, 1825.

(3.) Other decrees, being embodied in sections 3, 4, 5, 6 and 7 of chapter ninety of the organic law of the treasury, being law numbered twenty-six of the 2d of July, 1834.

The petition then proceeds to allege, that under and by virtue of said laws and decrees such proceedings were thereunder regularly and lawfully had as that the government of the state of Sonora, by its officers duly authorized by the laws aforesaid, and of said state, duly and regularly and for a good and valuable consideration, to wit, the sum of four hundred dollars, ($400,) in the lawful money of the state, and for other good and valuable considerations, in said grant title set forth and described, did on the 12th day of April, 1838, sell and convey to one Señor Don Fernando Rodriguez the land hereinbefore mentioned, and more particularly hereinafter described,

The allegation or claim then is a grant from the state of Sonora. There is no claim of a grant from the Mexican government. The grant, however, recites that it is done " in the name of the free and independent sovereign state of Sonora as well as of the august Mexican nation."

It is conceded that the ownership of the public lands was in

Spain and passed to Mexico upon its independence, and afterwards vested in the Mexican confederation or republic.

In *Republic of Texas* v. *Thorn*, 3 Texas, 499, 504, Justice Hemphill said:

"That the right of eminent domain over the public lands was originally vested in the federal government of México is, perhaps, not now subject to question. The confederacy of the Mexican states was not formed, originally, by a constitutional compact between the several separate independent states, nor by a grant of powers originally vested in the several provinces, which afterwards constituted the states of the union. The public lands of the United States of the north, before the acquisition of Louisiana and Florida, belonged originally to the several States, and became Federal property by purchase, or voluntary cession from the States. But, in the Mexican union, the general government claimed, originally, the property in the public domain. It is true that under former governments the provincial authorities had exercised certain powers of control over the public lands, but this was in subordination to the central or supreme authority of the country, whether vested in the crown, or represented by the vice royalty of New Spain, or in the sovereign provincial governing juntas, in the Emperor Iturbide, or the other authorities which succeeded, before the assemblage of the constituent congress which finally adopted the federal system, and out of the municipal subdivisions of the territory formed the states of the confederation."

If the title was in the Mexican union, how did it get into the states? There was no law explicitly conveying it. It is claimed, as alleged in the petition, by virtue of the sovereign general decree numbered seventy of the 4th of August, 1824, and the recital of the grant is:

"Whereas article II of the sovereign general decree No. 70, of the fourth of August, 1824, conceded to the states the revenue (rentas) which by said law are not reserved to the national government, one of which is the vacant land in the respective districts pertaining to the same, in consequence of which the honorable constituent congress of Sonora and Sinaloa passed

the law, No. 30, of the twentieth of May, 1825, and also sub-sequent legislations passed other decrees concerning the same matter, which dispositions have been embodied in sections 3, 4, 5, 6 and 7 of chapter 90 of the organic law of the treasury No. 26, of the 11th of July, 1834."

The decree of August 4, 1824, seems to be a revenue measure simply. We quote part of it, including sections 9 and 11, upon which special stress is laid:

"DECREE OF AUGUST 4, 1824.

" *Classification of general and special revenues.*

"The sovereign general constituent congress of the United States of Mexico has deemed it proper to decree:

"1. That import and export duties already fixed, and those which may be hereafter fixed under any denomination in the ports and on the frontiers of the republic, pertain to the general revenues of the federation.

"2. The import duty of fifteen per cent which shall be collected at the said ports and frontiers upon the tariff valuation, augmented by one fourth part upon foreign goods, which, on account of this duty, shall be free from local tax (alcabala) in the interior.

"3. The duty on tobacco and gunpowder.

"4. The local tax (alcabala) on tobacco at the places where it is raised.

"5. The revenue from the post offices.

"6. The revenue from the lottery.

"7. The revenue from salt mines.

"8. The revenue from the territories of the federation.

"9. The national property, in which are included that of the inquisition and the temporalities, and all other rural and urban estates which now belong, or which may hereafter belong, to the public treasury.

"10. The edifices, offices and lands attached to these, which now belong, or which formerly belonged, to the general revenues, and those which have been paid for for two or more of those which formerly were provinces, are subject to the disposal of the federal government.

" 11. The revenues which are not included in the foregoing articles belong to the states."

This law was passed between the dates of the constitutive act and the adoption of the constitution, the latter event taking place in October. It is claimed that nothing is said in the provisions of the decree preceding the eleventh article regarding the public lands, and that hence it is asserted that they are assigned to the states by that article. It is besides contended that the colonization act of August 18, 1824, confers the right on the states to dispose of the vacant lands within their borders. This contention is supported by *Goode* v. *McQueen's Heirs*, 3 Texas, 241; *Chambers* v. *Fisk*, 22 Texas, 504; *Wilcox* v. *Chambers*, 26 Texas, 180.

But if it be true that the state had rights in and powers of disposition of the public lands, these rights and this power could be surrendered, and it is contended by the appellant that they were surrendered by the constitution of 1836. Preceding this constitution, October 3, 1835, a law was passed abolishing state legislatures, and establishing departmental councils. (Reynolds, 195.) This law contained the following provision:

" 5. All the subordinate employés of the states also shall continue for the present, but the places now vacant or that shall become vacant shall not be filled, and they as well as the offices, revenues and branches of the service they manage are subject to and at the disposal of the supreme government of the nation, through the proper governor."

On the same day and as part of the same law the President made regulations, articles 10, 12 and 13 of which are as follows:

" 10. In everything relating to the department of the treasury the governors and the respective officers shall proceed in accordance with the laws, regulations and orders of each state, in so far as may be compatible with the new organization of said revenues for the future.

\*          \*          \*          \*          \*

" 12. Said governors, in matters relating to the revenues, shall communicate directly with the supreme government

through the secretary of the treasury, to whom they shall forward all documents and statements and consult when they consider necessary, being careful to cite the laws, orders and proceedings (expedientes) there may be on the matter.

"13. Until the attributes of the government and departmental boards in what relates to the treasury are declared by law, said governors shall make no sales of land (fincas) or property (bienes), nor contracts nor extraordinary expenses for said department, without the previous approval of the supreme government."

Certainly, as far as this law could affect it, there could be no sales "without the previous approval of the supreme government."

Following this law and these regulations a law was enacted establishing bases for a new constitution. The provisions which are pertinent to our inquiry are as follows:

"8. The national territory shall be divided into departments on the bases of population, locality and other contributing circumstances. Their number, extent and subdivision shall be given in detail in a constitutional law.

"9. For the government of the departments there shall be governors and departmental boards; the latter shall be elected by popular vote in the manner and number the law shall provide, and the former shall be appointed periodically by the supreme executive power, upon nomination by said boards.

"10. The executive power of the departments shall reside in the governors in subordination to the supreme executive of the nation. The departmental board shall be the council of the governor; they shall be charged with determining and promoting whatever conduces to the welfare and prosperity of the departments, and shall have the economic, municipal, electoral and legislative powers the special law for their organization shall provide, being in the matter of the exercise of the latter class subordinate and responsible to the general congress of the nation.

*    *    *    *    *

"14. A law shall systematize the public exchequer in all

its branches; shall establish the method of accounts; shall organize the tribunal for the revision of accounts and regulate the economic and contentious jurisdiction in this department."

The constitution of 1836 has no provision in regard to the public lands, nor does it define the duties of the minor administrative officers. As to divisions into departments it enacts as follows:

"Sixth Law. — Divisions of the territory of the republic and internal government of its towns.

"Art. 1. The republic shall be divided into departments according to the eighth law of the organic bases. The departments shall be divided into districts, and the districts into partidos.

"Art. 2. The divisions into departments shall be made by the first constitutional congress during the months of April, May and June of the second year of its sessions; and it shall do so by a law that shall be a constitutional one.

"Art. 3. During the remaining portions of that same year the departmental assemblies shall divide their own departments into districts, and the districts into partidos. They shall report to congress for approval of the same. Until the divisions stated in the two foregoing articles shall be made, the territory of the republic shall be temporarily divided by a secondary law."

By Art. 1 of Law No. 1807, December 3, 1836, the Mexican territory was divided into as many departments as there were states, with certain modifications which did not affect Sonora. 3 Mexican Statutes, 258. The effect of the constitution and laws necessarily was the destruction of the states as such. The government then ceased to be federal in form, and became centralized in character. The power of Sonora as a state, therefore, was extinguished. We have said that the constitution of 1836 has no provision in regard to the public lands, but the laws passed under it deal with them in such manner as to preclude the further rights of the states as such over them.

On January 17, 1837, a law was passed (Reynolds, 210)

establishing a national bank and creating a fund for redeeming certain currency.

Articles two and three are as follows:

" 2. The government, without loss of time, shall establish and provide regulations for a national bank, with the principal object of redeeming copper coin, the management of which shall be entrusted to persons elected by the different classes of society, in the manner said regulations shall provide, and who shall not be dependent on the government other than to render thereto an annual report of their administration.

" 3. There are adjudicated to the bank for a redemption fund :

" First. All the real property of the nation that exists in all the territory of the republic."

On April 12, 1837, a law was passed (Reynolds, 223) the seventh article of which is as follows:

" ART. 7. For greater security in the payment of the capital and interest of the consolidated fund, the government of Mexico especially mortgages, in the name of the nation, 100,000,000 acres of public lands in the departments of California, Chihuahua, New Mexico, Sonora and Texas, as a special guaranty of said fund, until the total extinction of the credits ; but if any sale of these mortgaged lands should be made, it shall be, at least, at the rate of said four acres to the pound sterling, and the proceeds thereof shall be paid by the purchaser to the agents of the government in London, from whom only he can receive the corresponding warrant, and the latter shall employ the proceeds of the same to pay the bonds of the new consolidated fund, which shall also be received in payment of said lands at the current price of said bonds in the market."

On April 17, 1837, a decree was promulgated (Reynolds, 224) creating the office of superior chief of the treasury, and providing for the manner of making purchases, sales and contracts on behalf of the nation, articles 1, 2, 4, 37, 73, 76 and 92 of which are as follows:

" ARTICLE 1. Until the general congress establishes the

revenues that are to form the national exchequer of Mexico, the revenues, taxes and property of which the supreme government is in possession, and the revenues, taxes and property which the departments established or acquired under the federal system, and which existed at the time of the publication of the decree of October 3, 1835, shall continue.

"2. The revenues, taxes and property which by the law of the 17th of last January were assigned to the national bank are excepted from the provisions of the last article until it fulfils its object."

"4. Superior chiefs of the treasury shall be located in each department with the powers designated in this decree. All the employés of the treasury in their respective districts, in the instances and manner which shall be designated, shall be subordinate to them."

\*          \*          \*          \*          \*

"37. It is the duty of the departmental treasurers :

"To muster the troops that may be in the capital, to issue to them their vouchers, to make abstracts of the muster and estimates, and to discharge, in the department of war, the powers given to the commissaries general and auditors of the treasury by the regulations of July 20, 1831, which for the present remain in force in all that is not opposed to this decree and subsequent laws."

\*          \*          \*          \*          \*

"73. All the purchases and sales that are offered on account of the treasury and exceed $500 shall be made necessarily by the board of sales, which, in the capital of each department, shall be composed of the superior chief of the treasury, the departmental treasurer, the first alcalde, the attorney general of the treasury and the auditor of the treasury, who shall act as secretary. Its minutes shall be spread on a book which shall be kept for the purpose, and shall be signed by all the members of the board, and a copy thereof shall be transmitted to the superior chief of the treasury for such purposes as may be necessary and to enable him to make a report to the supreme government."

\*        \*        \*        \*        \*

" 76.  The minutes of the board shall be spread on the proper book, which shall be signed by all the members thereof, and an authenticated copy transmitted to the superior chief of the treasury to enable him to make a report to the supreme government when the case requires it."

\*        \*        \*        \*        \*

" 92.  The powers that by various laws are given to the commissaries general and the subcommissaries shall be exercised in future by the superior chiefs of the treasury and their subordinates, in so far as they do not conflict with this decree, for in that respect all existing laws stand repealed."

The regulations of July 20, 1831, referred to, provide for the organization of the boards of public sales, " junta de almoneda," and its powers.  Sections 131, 132 and 133 are as follows :

" ART. 131.  But in order to hold such meetings it is necessary that the sales or purchases to be made must be announced to the public, at least eight days before, by means of placards to be posted at prominent and conspicuous places, having their contents published also in newspapers having the largest circulation, if there be any such papers in the place, the commissaries being careful that in said notices both the more essential circumstances and the necessary instructions pertaining to the matter be inserted."

Article 132, which prescribes the manner in which the sale shall be conducted, which said article is as follows :

" ART. 132.  Once that the meeting shall be opened and the corresponding proclamations made by the public crier, bids legally made shall be admitted until the closing day of the sale, when it shall be declared in favor of the highest bidder by a majority of the meeting.  This act, together with whatever else took place at the auction sale, will be placed on record in a book kept by the commissaries or subcommissaries for that purpose, all the members signing therein, together with the attending witnesses, or with a notary, who (the notary) shall moreover write the other deeds connected with the transaction.  In case there be no notary in the place, then

a clerk, brought for the purpose by the commissary general, shall reduce to record the act and decision of the meeting."

Article 133, which is as follows:

"ART. 133. When the term prescribed by law expires the commissaries or subcommissaries shall send the expediente, together with an accompanying report, to the supreme government, without whose approval the sale, purchase or contract cannot be carried into effect."

If the title to the vacant lands or the right to dispose of them belonged to the State of Sonora, the junta de almonedas had no function to perform in regard to them; in other words, it was a national instrumentality, not a state instrumentality. If, however, the vacant lands became the property of the national government by the constitution of 1836, and could be disposed of by or through the junta de almonedas, the procedure required by the law creating it would have to be followed. This law provided that sales and purchases made by the board (junta) should be published for at least eight days beforehand, and by placards which shall be posted in the most public and frequented places, and shall be inserted in the newspapers of the greatest circulation, if there be any in the place, the notice to contain the more essential circumstances and the necessary instructions pertaining to the matter. These provisions are not shown to have been complied with, and the record precludes any presumption that they were.

There are other laws of the national government which are inconsistent with the rights of the states after 1836, to dispose of the public lands. That of December 7, 1837, is of that character; also that of September 15, 1837. The law of December 7, 1837, provides as follows:

\*          \*          \*          \*          \*

"First. To witness or vise, in person in the capitals and by the civil authority in each one of the other places in the department, the monthly and annual cash statements made by the several chiefs of the offices of the treasury and to report without delay to the supreme government the omissions and abuses they may observe,

"Second. To preside over the boards of sale and of the treas-

ury, with power to defer the resolutions of these latter until, in the first or second session thereafter, the matter under consideration is more thoroughly examined into."

The law of September 15, 1837, provided for a convention between English bondholders of Mexican bonds and the Mexican government, (Reynolds, 227,) section seven of which reads as follows:

" 7. For greater security in the payment of the principal and interest of the consolidated fund, the Mexican government, in the name of the nation, specifically mortgages 100,000,000 acres of public lands in the departments of the Californias, Chihuahua, New Mexico, Senora and Texas, as a special guarantee of said fund until a total extinction of the credits; but if any sale of the mortgaged lands should be made it shall be made at least at the rate of said four acres to the pound sterling, and the proceeds shall be paid by the purchaser to the agents of the government in London, from whom only he can receive the corresponding inscriptions, and they shall use the proceeds of the sale to redeem the bonds of the new consolidated fund, which may also be received in payment of said lands at the price said bonds have in the market.

" The Mexican government, besides the general mortgage contained in this article, expressly reserves, by a public decree, 25,000,000 acres of the lands of the government in the departments of closest communication with the Atlantic, and which appear most suitable for colonization from the outside. Said lands shall be specially and exclusively set aside for the deferred bonds, in case it is desired to exchange them for lands, and, if the government sell them, the proceeds therefrom shall be devoted to the redemption of said bonds."

On June 1, 1839, a law was passed approving the above-named convention, (Reynolds, 232,) and article 3 of this law is as follows:

" 3. With respect to the colonies that may be established by virtue of the convention, the government shall see that the existing laws on colonization, or those that may be enacted hereafter, are observed in so far as they are not contrary to the convention itself."

It is not clear from the brief of appellee that he claims that the state had the power of disposition of the lands under the colonization laws. The petition does not claim it, nor is the grant in words based upon it. By the law of August 18, 1824, there was reserved to the general congress a power to prohibit colonization "to the individuals of some particular nation." This no doubt was directed to "individuals" from the United States. In pursuance of this power the general congress promulgated a law dated April 25, 1835, article two of which was as follows:

"ART. 2. In the exercise of the powers reserved to the general congress in article 7 of said law of August 18, 1824, the frontier and littoral states are prohibited from alienating their vacant lands for colonization until the regulations to be observed in carrying it out are established."

Between the date of the law and the grant in this case no regulations to be observed in carrying out colonization were established. On the contrary, by a law passed April 4, 1837, all colonization laws were certainly modified and may be repealed. The law was as follows:

"The government, in concurrence with the council, shall proceed to make effective, the colonization of the lands that are or should be the property of the republic, by sales, leases or mortgages, and shall apply the proceeds (which in the first case shall not be less than $1.25 per acre) to the payment of the national debt, already contracted or which shall hereafter be contracted, always reserving enough to meet its obligations to the soldiers who took part in the war of independence, and for the remuneration and gifts congress may grant to Indian tribes and nations, and those who assisted in the restoration of Texas, and it shall not be compromised by the laws heretofore enacted on colonization, which enactments are all repealed in so far as they conflict with this law, but the prohibition of article 11 of the law of April 6, 1830, shall remain in force."

As has already been stated, the grant recites that it was made "in the name of the free and independent and sovereign state of Sonora as well as that of the august Mexican nation." This, it is contended, authenticates the power of the granting

officer, and Chief Justice Marshall in *Delassus* v. *United States,* 9 Pet. 117, 134, is quoted:

"A grant or concession made by that officer, who is by law authorized to make it, carries with it *prima facie* evidence that it is within his power. No excess of them, or departure from them, is to be presumed. He violates his duty by such excess, and is responsible for it. He who alleges that an officer entrusted with an important duty has violated his instructions must show it."

So also it was said by this court in *Strother* v. *Lucas,* 12 Pet. 410, that —

"Where the act of an officer to pass the title to land according to Spanish law is done contrary to the written order of the king, produced at the trial without any explanation, it will be presumed that the power has not been exceeded, and that it was done according to some order known to the king and his officers, though not to the subjects, and courts ought to require very full proof that he had transcended his powers before they so determine it."

These principles were asserted of Spanish titles in the Territories of Louisiana and Florida. They are disputable in their application to titles under the Mexican laws. *United States* v. *Cambuston,* 20 How. 59. But we need not dispute them, for the proof in this case satisfies their requirement. It is ample to show that the national laws were not pursued, and besides it is conceded that at the time of the grant the state of Sonora was in rebellion against the nation. It and its officers therefore were opponents of the national authority, not its instruments; while declaring independence of it, they could not claim to act for it and convey its title.

The appellee further contends that the national government approved the title of Rodriguez. The laws which have been quoted provide that when the property had been knocked down to the highest bidder a minute or report of the proceedings was required to be made and transmitted to the supreme government, either directly under the regulations of 1831, or first to the supreme chief of the treasury under the act of April 17, 1837, and the sale could not be executed until

the approval of the supreme government. By supreme government was meant the national government, and hence the approval of the governor of Sonora, which the record shows, was not sufficient. The certificate of the governor is limited and significant —

"*Supreme Government of the free State, D. E. S. O. N. R. A.*

"This supreme authority approves the title which your honor has issued on yesterday in favor of the Señor Don Fernando Rodriguez, a resident of Hermosillo, for five square leagues of land in front of the confluence of the rivers Gila and Colorado, and the Paso de los Algodones, on the northern frontier of the state. I say this to you in reply to your note of yesterday reiterating the consideration of my regard.

"God and liberty.

"Arispe, April 13, 1838.        LEONARDO ESCALANTE."

It is contended, however, that a communication of an officer of the state of Sonora to an officer of the general government made in 1847, and a certificate of the governor of Sonora given two days later, justify the presumption that the sale had been approved by the general government. We give them in full:

"To the treasurer general of the state:

"Jose Maria Mendoza, provisional commissary general of the state of Sonora, certifies that on this day he has directed, under a separate cover, and as a special matter, to his excellency the minister of state, by del despacho de hacienda of the republic, an official communication, of which the following is a copy:

'General Commissary Department of the State of Sonora:

'SIR: The Señor Don Fernando Rodriguez, a resident of the city of Hermosillo, has presented to me the title which was issued in his favor by the general treasury of the ancient state, on the twelfth of April, 1838, for five square leagues of vacant lands for cultivation, reg-

istered by the said Rodriguez, contiguous to the rivers Gila and Colorado, in front of the confluence of the same,' and the point named Paso de los Algodones, of the said river Colorado, in the northern part of this state, and which were for him surveyed, valued and were sold by the Junta de Almonedas, and were adjudicated in the manner as shown by the (testimonio autorizado) certified copy, which I have the honor to transmit to your excellency to the end that the same may be presented to his excellency the President of the republic, for which purpose the said Señor Rodriguez has presented the said title to me of the lands situated in front of the confluence of the Gila and Colorado rivers and the Paso de los Algodones of the Colorado.

' I have the honor to repeat to your excellency the consideration of my regard.

'God and liberty.          JOSE MARIA MENDOZA.

'URES, June 6, 1847.

'To his excellency the minister of state del despacho de hacienda de la Republica Mexico.

'In witness whereof I give this at the request of the interested party Don Fernando Rodriguez, at Ures, the capital of the state of Sonora, on the sixth of June, 1847.

'JOSE MARIA MENDOZA.'

"The licendiado, Jose de Aguilar, governor of the state of Sonora, certifies in due form of law that the present title, which includes five square leagues of land contiguous to the rivers Gila and Colorado, in front of the confluence of the same, and also to the point named El Paso de los Algodones, of the said river Colorado, on the northern frontier of the state, measured and adjudicated in the year 1838 to Don Fernando Rodriguez, a resident and native of Hermosillo, was legally issued by the late Jose Justo Milla, contador of the general treasury of the state, and legally encharged with the said treasurer's office at the date referred to; and that in

virtue of which he was competently authorized to for expe-
dientes of lands, to measure and adjudicate the same and to
issue titles therefor; and also that his signature, those of his
assistants and the seal stamped on said title are the same that
they are accustomed to use in their official acts, and with
which they have legalized all their official acts of like nature.
Finally he certifies that the approval of the government, which
is attached to the title and the certificate of Don Jose Maria
Mendoza, are legal, and that their signatures are such as they
have used in their official acts, and as such are entitled to all
faith and credit, judicially or extrajudicially.

"And at the request of the interested party I give this in
Guaymas, on the eighth of June, 1847.

"JOSE DE AGUILAR."

These do not establish the presumption claimed for them.
The letter to the Mexican minister of state is dated nine
years subsequent to the sale and grant to Rodriguez. It
should have preceded the grant. Had it done so some pre-
sumption of approval might then have been deduced from
the grant of the performance of precedent conditions. The
approval of the government stated in the certificate of Gov-
ernor Jose de Aguilar manifestly refers to the approval of
his predecessor, Leonardo Escalante, and not an approval by
the general government. There is no other approval " which
is attached to the title and the certificate of Don Maria
Mendoza."

There was introduced in evidence an *ex parte* affidavit
alleged to have been made in 1881 before the treasurer gen-
eral of the state of Sonora by one Matias Moran and one
Antonio Corrillo. Who these persons were is not stated.
Matias has no identification but his name. Antonio Corrillo
is designated "citizen." Of this paper the following testi-
mony was given by Bartolome Rochin, keeper of the archives
of the treasury at Hermosillo :

"Q. 41. In whose handwriting is this paper?
"A. It is in the writing of the same Mr. Telles, who was
the same treasure general.

"Q. 42. When was Mr. Telles treasurer general?

"A. It is not mentioned the date here, but I have a great many documents that tell (after looking), '77 or '78.

"Q. 43. Has this paper been with the records of the treasurer general's office since you have had charge of the office?

"A. Yes, sir; I took this document from the archives of the treasurer general's office."

The following is as much of the affidavit as we think necessary to quote:

"I, Manuel Diaz, as treasurer general of the state of Sonora, Mexican republic, acting by notary public, appeared Matias Moran and citizen Antonio Corrillo, of this precinct, who do say that, being personally present in the treasury office for the purpose of giving (11) compliance to the foregoing disposition or order of the governor of the state, proceeded to examine, one by one, the signatures of which are contained in the expediente that forms the title to the lands situated between the Colorado and Gila rivers, that in the year 1838 was adjudicated to Don Fernando Rodriguez, in that of 1847 was approved by the supreme government of the nation, as a result of the examination we have made of the original expediente above referred to, the lines with which it is written and the signatures that accompany (?) it, we are able to certify."

This affidavit is very questionable. It was testified to be in the handwriting of a Mr. Telles, who, it was also testified, was treasurer general in 1877 and 1878, and was taken from the archives by the witness who produced it. At whose instance it was taken, or for what purpose, does not appear, except that it is recited in it that the persons who made it were personally present "for the purpose of giving compliance to the foregoing disposition or order of the governor of the state." What disposition or order is not explained. The language of the paper is very ambiguous. It is not clear whether it is the notary who, acting for Manuel Diaz, treasurer general, or the deposing witnesses, who recite that the title was in the year 1838 adjudicated to Don Fernando Rodriguez, and in that of 1847 was approved by the supreme

government of the nation. But even if by the latter, it is distinctly not their testimony, but only an assumption preceding it. This testimony comes afterwards, and is confined to the verification of certain signatures.

*It follows from these views that the decree of the Court of Private Land Claims should be and it is reversed and the cause remanded for further proceedings.*

Mr. Justice Gray concurred in the result.

Mr. Justice Brewer, Mr. Justice Brown, Mr. Justice Shiras and Mr. Justice Peckham dissented.