**UNITED STATES v. JONES.**

No. 11963.

United States Court of Appeals
Ninth Circuit.

June 24, 1949.

Henry L. Hess, U. S. Atty., Victor E. Harr, and Gene B. Conklin, Asst. U. S. Attys., Portland, Or., for appellant.

Thomas H. Tongue, III, Neal W. Bush, Hicks, Davis & Tongue, Portland, Or., for appellee.

Before: DENMAN, Chief Judge, and STEPHENS, Circuit Judge, and YANK-WICH, District Judge.

YANKWICH, District Judge.

On October 15, 1947, the appellant, United States of America, to be referred to as "the Government", as plaintiff, instituted an action against Herbert A. Jones, Jr., the appellant, as defendant, in which it sought to set aside and rescind a sale of certain surplus materials to Jones, made on October 30, 1946. The Complaint stated a single claim or cause of action,—mutual mistake. On December 4, 1947, an amended Complaint was filed which added to the causes of action of the original Complaint three others, (1) unilateral mistake, (2) lack of authority of the agents negotiating the sale, and (3) sale at an unfair price in violation of the Surplus Property Act of 1944. 50 U.S.C.A.Appendix, §§ 1611–1646.

A pretrial order, signed and approved by counsel, was not signed by the Court, Rule 16, Federal Rules of Civil Procedure, 28 U.S.C.A. And see, Fowler v. Crown-Zellerbach Corp., 9 Cir., 1947, 163 F.2d 773, 774. It was not included by the Clerk in the transcript on appeal and is before this court only because counsel for the Government have attached it as an appen-

dix to their brief. However, in view of the fact that the trial judge indicated, at the trial, that the order would be signed and counsel, throughout the trial, assumed that the issues were as stated therein and that no testimony would be directed to any matters admitted in the order, and even on this appeal, counsel take the facts in the pretrial order as proved, we may refer to it as a stipulation for such admissions as may be pertinent to the discussion to follow.

After trial, the Court, on March 4, 1947, gave judgment in favor of the defendant Jones and dismissed the Complaint.

This is an appeal from the judgment.

In its challenge of the findings and judgment, the Government insists that uncontradicted evidence, which should have been given binding effect by the trial court, establishes that the sale was invalid (1) for lack of authority, (2) for mistake on the part of the Government in its consummation, and (3) that the trial court erred in dismissing the Complaint without adjudicating fully the rights of both parties in the matter.

## I. Narrowing of Issues

### (A) *Discretion in Declaratory Relief.*

The obvious answer to the last assertion is that,—as the Declaratory Judgment Statute makes the granting of relief discretionary,—when a trial court reaches the conclusion, as it did in this case, that judgment should be against the actor in the lawsuit, it would be an illusory act to grant a further declaration of rights. 28 U.S.C.A. §§ 2201–2202; and see, Eccles v. People's Bank, 1948, 333 U.S. 426, 431, 68 S.Ct. 641, 92 L. Ed. 784; Declaratory Judgments, 1940, 1

F.R.D. 295, 301. This was not a dismissal without a trial. Cf. Guardian Life Ins. Co. v. Kortz, 10 Cir., 1945, 151 F.2d 582. The dismissal was ordered, *after a trial on the merits*. It was part of a decree which gave judgment in favor of the defendant upon findings which concluded that the Government was "not entitled to rescind said sale or to the other relief prayed for".

A declaration of rights, after such conclusion, would have served no useful purpose. And it is an accepted principle that no declaration should be made, unless it serve a useful, practical purpose, or when no beneficial result would follow. See, 1 C.J.S., Actions, § 18(12), pages 1033-1034; Borchard, Declaratory Judgment, 2 Ed., 1941, pp. 296, 299; Aetna Casualty & Surety Co. v. Quarles, 4 Cir., 1937, 92 F.2d 321, 325-326; Smith v. Massachusetts Mutual Life Insurance Co., 5 Cir., 1948, 167 F.2d 990; Redlands Foothill Groves v. Jacobs, D.C.Cal.1940, 30 F.Supp. 995.[1]

The present cause was not solely a declaratory judgment action. It sought a specific equitable decree declaring the sale to be void and the plaintiff to be the owner of the property, and vacating and rescinding the sale. Declaration of rights was asked, ancillary to the affirmative relief, and coincident with a prayer for general equitable relief.

There was, therefore, more cogent reason for denying a declaration when the primary relief sought—invalidation of the sale and restitution of ownership of the property to the plaintiff,—was denied. Even in ordinary civil actions, when the court has reached a conclusion upon the main issues involved, and has decided them against a liti-

[1] The identical contention was made in Greene v. Riordan, 1929, 97 Cal.App. 462, 276 P. 141, which arose under the California Declaratory Judgment Statute, California Code of Civil Procedure, Secs. 1060–1062. The main controversy there was whether a certain deed was a mortgage and whether the vendor was entitled to the balance of the purchase price.

The trial court determined the controversy adversely to the plaintiff. On appeal, he argued that the court should have determined other matters, such as whether or not the agreement was still subsisting and subject to performance, whether either party was in default, or what the future rights and obligations of the parties at the time of trial were. The answer of the California District Court of Appeal was: "Having made such adjudication, and in so doing having placed a construction upon and determined the validity of the written instruments in question for the guidance of the parties, the trial court was, under section 1061, Code of Civil Procedure, above quoted, required to do no more." Greene v. Riordan, 1929, 97 Cal.App. 462, 472, 276 P. 141, 145.

gant, it needs only state the ultimate facts and need not make findings on every incidental fact which the litigant may have sought to put in issue. McGee v. Nee, 8 Cir., 113 F.2d 543; Klimkiewicz v. Westminister Deposit & Trust Co., 1941, 74 App. D.C. 333, 122 F.2d 957; Schilling v. Schwitzer-Cummins Co., 1944, 79 U.S.App.D.C. 20, 142 F.2d 82; and see, Findings, 1948, 8 F. R.D. 271, 284-286.

It follows that if, as we have concluded, the ultimate disposition of the case by the trial court was correct, there was no error in its failure to make the declaration of rights which the Government sought.

(B) *Federal Law Governs the Sale.*

Another contention can be disposed of with brevity.

■■ Jones asserts that the validity of the agreement between him and the Government is governed by Oregon law.

We cannot agree.

This is a case in which the Government, in its sovereign capacity, deals with property which it owns. Its contracts relating to such property stem from ownership, and the manner of its sale is governed by specific federal statute. There is, therefore, no room for the application of any local law merely because the sale took place in Oregon, was made to a citizen of Oregon by government agents resident in Oregon. As said in United States v. Allegheny County, 1944, 322 U.S. 174, 182, 64 S.Ct. 908, 913, 88 L.Ed. 1209:

"Every acquisition, holding, or disposition of property by the Federal Government depends upon proper exercise of a constitutional grant of power. * * * The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all present questions of federal law not controlled by the law of any state."

And see, Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838; S.R.A., Inc. v. Minnesota, 1946, 327 U.S. 558, 565-566, 66 S.Ct. 749, 90 L. Ed. 851; United States v. Standard Oil Co.,

1947, 332 U.S. 301, 308-309, 67 S.Ct. 1604, 91 L.Ed. 2067.

We come now to the other grounds urged for reversal.

## II. Lack of Authority

(A) *The Authority of Public Officers.*

The trial court made no specific finding as to the authority of the agents of the Government to make the sale in the manner in which they did. But the court found: "Substantial evidence was introduced to establish that it was the custom and practice of said War Assets Administration, when goods could not or were not sold on a bid or fixed price basis for a substantial recovery, to offer said goods for sale on a negotiated basis for the best price offered. Substantial evidence was also introduced to establish that the foregoing sale was in accordance with said custom and practice." Finding VII.

The Government attacks this Finding upon the ground that Delbert F. Webb, the clerk-typist of the War Assets Administration, who made the sale to Jones, had no authority to make the sale in the manner and at the price he did.

■■ It is, no doubt, true—to use a phrase which has become trite through constant use—that in assaying the acts of public officers, "the mode is the measure of the power." This means that a public officer, in exercising powers conferred upon him by statute and regulation, is bound to follow the mode or manner prescribed. One who deals with such official is on his notice of possible limitations of authority. And no estoppel can arise against the Government from the performance of unauthorized acts or from authority exercised in a manner forbidden. 43 Am.Jur., Public Officers, Secs. 249, 256; 54 Am.Jur., United States, Sec. 92; Wisconsin Central Railroad Co. v. United States, 1896, 164 U.S. 190, 211, 17 S.Ct. 45, 41 L.Ed. 399; Utah Power & Light Co. v. United States, 1917, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791; United States v. City and County of San Francisco, 1940, 310 U.S. 16, 31-32, 60 S.Ct. 749, 84 L.Ed. 1050.

It is also true that officers of the Government of the United States are held to the utmost good faith, and one who deals with them cannot take advantage of their fraud towards the Government. 43 Am.Jur., Public Officers, Sec. 261; 54 Am.Jur., United States, Sec. 92; Hume v. United States, 1889, 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393. At the same time, presumption of legality attaches to the act of a public officer. As Chief Justice Marshall put it in an old case, an act done by an officer authorized by law to perform it "carries with it prima facie evidence that it is within his power" and "he who alleges that an officer intrusted with an important duty has violated his instructions must show it". Delassus v. United States, 1835, 9 Peters 117, 134, 9 L.Ed. 71. And see, United States v. Coe, 1898, 170 U.S. 681, 696–697, 18 S.Ct. 745, 42 L.Ed. 1195; Lamport Mfg. Supply Co. v. United States, 1928, 65 Ct. Cl. 579, 610.

Neither fraud nor venality on the part of any of the agents of the War Assets Administration was charged.

Was there lack of legal authority?

(B) *The Agreed Facts.*

Certain agreed facts may first be stated.

The United States Maritime Commission and the War Assets Administration (to be referred to as W.A.A.) are agencies of the United States. The latter became such under the Surplus Property Act of 1944, 50 U.S.C.A. Appendix, § 1611 et seq., and was designated as a disposal agency by Executive Order No. 9689, 50 U.S.C.A. Appendix, § 1614A note, 11 Fed.Reg., 1946, 1265. Between May 29, 1946, and June 22, 1946, certain universal gear joints described as Lots 27, 28, 29 and 30 in a special offering designated as "Special Offering No. C-296" were declared surplus property to W.A.A. by the United States Maritime Commission. The declarations described the property fully, and those relating to the universal gear joints, which are in the record, gave the names of the manufacturers. W.A.A. undertook to dispose of the property in accordance with the Act and the regulations under it. Universal gear joints, together with other items, were denominated for disposal by the Automotive and Machinery Sales Division of W.A.A., which, at the time, had a full and complete description of the joints and other items.

It was a practice of W.A.A. to cause to be issued and circulated, from time to time, special offerings to interested parties. In the present case, the advertising section circulated a special offering to 4723 persons in the automotive trade and others dealing in hardware, machinery, farm implements and scrap to interested veterans who had placed their names of record. The special offering C-296, dated October 4, 1946, listed and described the equipment, machinery and accessories advertised and invited bids on them. The universal gear joints, together with other equipment and parts, including automotive equipment parts and non-automotive equipment and parts, were fully described in the offering, *which indicated their location at the Oregon Ship Building Corporation Yard at Portland Oregon.* No bids were received on the deadline,—2 o'clock P.M., October 24, 1946, —on the universal gear joints and other items. The residue of unsold items consisted of a dump truck body, 12 brass plug coils, 2 jeep motors, 104 King pins for trailer hitches, 2 Norgren lubricators for circulating pumps, 240 miter gears and two chess wagons. On October 30, 1946, Jones inquired of a W.A.A. salesman (Delbert F. Webb) whether there were any jeep motors for sale. He was informed that two jeep motors were available, but that they could only be purchased as a part of the entire unsold residue of special offer C-286. At the time, Jones and the salesman had in their possession a description of the goods in the entire offering. After considerable discussion, the salesman offered to sell all the residual items to Jones for $75.00. Jones agreed to buy at that price, later paying it by check to a W.A.A. cashier. Sales memoranda,—Form W.A. A.-2(a)—were issued to Jones covering the sale. They were dated November 1, 1946, and described the property in detail. W.A.A. mailed to Jones a receipt for the check, dated the same day, as well as bills

of sale,—Form W.A.A.-1(a). Jones was allowed to take delivery of all the items except Lots 27, 28, 29 and 30, being the universal gear joints, as to which W.A.A. and the Commission refused delivery when demand was made on November 12, 1946. Coincident with the filing of the Complaint, on September 26, 1947, the Government tendered to Jones the sum of $69.13, being the portion of the sales price apportioned to the universal gear joints, Jones rejected the tender and the Government paid the amount into the Registry of the Court.

(C) *The Facts in Dispute.*

It is evident from what precedes that there is no dispute as to the mechanics of the sale. The disputed facts relate to the authority to make the sale. As to them, the area of disagreement is not large. The persons involved, on the Government's side, were C. T. Mudge, Regional Director of W.A.A. at Portland, Oregon; R. M. Givens, his Special Assistant, Chief of the Sales Assistance Division, and Chief of the Organization Division; "Cece" Williams, Chief of the Awards Division; Louis A. Zanon, Assistant Deputy Regional Director in charge of Disposal and Sales; William J. Burgoyne, Acting Chief of the Automotive and Construction Machinery Division; and Delbert F. Webb, Clerk-Typist. Their relation to the transaction was as follows:

Webb conducted the negotiations with Jones, after Williams had ordered that the residue be offered for sale at the best price "that could be obtained." Webb considered the sale a "negotiated" sale. Under his direction, a girl-typist made out Form WA A-2 It showed a "bid" sale, *because the residue was a part of what had originally been a bid sale.* This was done only after the terms of the sale to Jones had been discussed with Burgoyne, who gave Webb permission to sell, and told him "to go ahead and write up the order." A Mr. Peterson, who was in his department, signed Burgoyne's name to the form and "put his initials below". The procedure followed, as Burgoyne admitted at the trial, was not, necessarily, contrary to the custom or practice of the Administration at the time in disposing of residue after no bid had been received. In fact, he stated that, while the residue is "re-programmed and offered on a bid basis", in some cases "material is offered on a negotiated sale, —material that was not necessarily in big demand".

From Burgoyne the form went to Zanon, who approved it by initialing it. Burgoyne was asked if he had authority to sell the lot for $75.00 He replied, "The only authorization that was made, it was signed by Mr. Zanon". And to the question, "In other words, he confirmed your sale, is that right?", he answered, "Yes, he signed the WAA-2".

Under limitations of authority by the Regional Director, Mudge, and a special regulation, Williams and Zanon had authority to approve sales up to $100,000.00 of the acquisition cost, Burgoyne up to $50,000.00, while Webb had no authorization at all. The refusal to deliver was based on a purported withdrawal of the items by the Maritime Commission. Zanon did not assert lack of authority when discussing the refusal to deliver with Jones. And, while it is claimed that Mudge's letter to Jones' attorney, Neal W. Bush, dated December 4, 1946, is a repudiation of the sale, it did not claim lack of authority. On the contrary, it stated: "It would appear, Mr. Bush, that someone in the office erred in classifying the material in question,—namely, Universal Gear Joints as automotive equipment. This, I understand, is a Maritime commodity and if this is the case, it should not have been offered by the Automotive Section."

In effect, error was asserted as to the section which offered the material for sale. *There was no claim of absence of authority to consummate the sale on the part of the persons who executed the sales documents.* Mudge was called as a witness by the defendant. He proved a reluctant witness. But, while the record does not show that he was called as an adverse witness under Rule 43(b), Federal Rules of Civil Procedure, he admitted stating in his deposition that when the letter was written,

284

there was no question "as to the authority of the person who fixed the price of these goods".[2]

And the trial judge could properly give full credence to this admission by the "head man". The problem which confronted the trial judge was similar to the one which was before this court in a very recent case, Grace Bros. v. Commissioner, 9 Cir., No. 11.976, 173 F.2d 170. Adult, mature persons signing documents which authorize the doing of certain acts, attempting to avoid, later, the full implication of their approval. When faced with such denials and contradictory statements, and lack of assertion of absence of authority, at the time of the transaction,—the judge was right in taking at their full value their original actions, expressed in formal documents, prepared by them and their subalterns, and in refusing to accept their subsequent attempted retractions after their actions had been questioned by superior authority. The more so, when their own testimony disclosed that other transactions of similar character had been made, that the Regional Director never questioned the authority of the person who made the sale to fix the price, and that the sale was within the express authority of his immediate superiors who approved the sale and signed the proper instruments acknowledging transfer of title to the purchaser. As against these revealing facts indicating approval by the entire administrative hierarchy, the claim of certain of these public officers that *some unwritten intradepartmental procedural custom* (unknown to the public with whom they were dealing) was not followed, and that, had they known this, they would not have approved the sale, carried no conviction to the judge.

[2] The entire portion of the examination is worth considering. It reads:

"Q. Now, originally was there any question as to the legal authority of the War Assets Administration to make this sale? A. Was there any legal * * *

"Q. Any question as to the authority to make this sale? A. A question as to the authority of War Assets to make the sale of property declared war surplus assets?

"Q. What I am asking is this, Mr. Mudge: Originally and at the time you wrote this letter was there any question in your mind as to whether this sale exceeded the authority of the War Assets Administration and its representatives? A. Well, I'd like to answer that, but I didn't see the sales documents on the case and I didn't know about it except by hearsay comment about the office.

"Q. To refresh your recollection, Mr. Mudge, I will call your attention to the deposition taken in the—I don't have the date on which it was taken, but you will recall the incident, I think * * * A. Yes.

"Q. * * * in which you were asked this question: 'Question: Does that authority include the power to approve or disapprove such sales? 'Answer: Within the specified policy limits, yes. 'Question: Can you briefly state what those limits are, Mr. Mudge? 'Answer: I can't, no, not without reference to the delegations of authority. 'Question: Are those limits involved in this case, Mr. Mudge? 'Answer: No, no; this is within the lim-its of the Regional Office's authority, yes. Do you recall that now? A. Yes, that is true.

"Q. And do you also recall that at the time of that deposition, whether you were asked this question: 'Is there any question as to the authority of the person who fixed the price of these goods?' 'Answer: No, I think not'. A. To fix a price for goods?

"Q. To fix a price for these goods? A. Well, I must have misunderstood the question, then.

"Q. Now, originally, was there any question as to the complete good faith of Mr. Jones in this case? A. I don't—Not to my personal knowledge.

"Q. This deposition was taken after you wrote this letter, was it not? A. Yes.

"Q. In which you purported to have complete information, and I call your attention to the fact that in this deposition, you were asked this question: 'Is there any question in your mind as to the good faith of Mr. Jones in this matter? 'Answer: No, not that I know of. He was looking for a bargain, perhaps.' A. That would be true.

"Q. Now, originally, was there any part of this sale questioned other than the gear joints themselves? A. Not so far as I was concerned.

"Q. What was that? A. Not so far as I was concerned. I didn't know anything about the programs.

"Q. Do you know what these goods are worth? A. Do I? No."

And, from our own analysis of the record, we cannot say that his conclusion was "clearly erroneous". Rule 52(a), Federal Rules of Civil Procedure. See, Muschany v. United States, 1945, 324 U.S. 49, 57-58, 65 S.Ct. 442, 89 L.Ed. 744.

## III. Mistake

### (A) *Unilateral Mistake.*

The original Complaint and the first cause of action of the amended complaint pleaded mutual mistake as a ground for rescission.* *This ground was abandoned at the trial.* Unilateral mistake—mistake as to the real or intrinsic value of a portion of the goods sold,—the universal gear joints,—remained an issue in the case. On this subject, the Findings of the trial court read:

I

"On or about October 4th, 1946, the plaintiff, through the War Assets Administration, an agency of plaintiff, issued a written invitation for bids upon various items of surplus property and mailed the same to 4723 dealers, including dealers in hardware, equipment and scrap metals. No bids were submitted upon 4824 universal gear joints and various other items, all of which remained as a residue. Said War Assets Administration then issued directions that this residue be placed on sale at the best price offered; and a reasonable test of the market had been made by plaintiff before said goods were sold to defendant.

II

"On or about October 30, 1946, defendant was informed by said War Assets Administration of the foregoing facts and was offered the sale of said residue for the sum of $75. Defendant was shown by said War Assets Administration a complete and accurate description of all of the items of said residue. Both plaintiff, its agents and defendant were familiar with the nature of said items. There is no substantial evidence to establish the value of said items at the time of said sale other than that the value of said items, and in particular of said universal gear joints, was substantial, but that the exact value of said goods was questionable and speculative, which said facts were recognized both by plaintiff, its agents and defendant and all of said negotiations, including the determination of said price and their subsequent sale, were the deliberate and intentional acts of plaintiff, its agents, and defendant, and the means of information as to the value of said goods were open alike to all of said parties.

III

"No mistake was made by either plaintiff, its agents or defendants as to the identity, nature or value of said items, including said gear joints, nor was there any mistake that determined the conduct of either plaintiff, its agents, or defendant, nor did defendant have any knowledge or reason to know that plaintiff or its agents made any such mistake or lacked authority to make said sales. No representation or fraudulent act or inducement, either actual or constructive, was made or engaged in by defendant and defendant acted in good faith at all times. Nor is there any evidence that plaintiff or its agents were misled by defendant in any way from any act, inducement or representation by defendant and there was no concealment of facts or imposition."

The modern tendency is to recognize unilateral mistake as a ground for rescission of an unexecuted contract. 5 Williston on Contracts, Revised Ed., 1937, Secs. 1573, 1578; Restatement, Contracts, Sec. 503; Restatement, Restitution Sec. 12(c); Hearne v. New England Mutual Marine Insurance Co. 1874, 20 Wall. 488, 22 L.Ed. 395; Moffett, Hodgkins, Clarke & Co. v. Rochester, 1900, 178 U.S. 373, 385, 20 S.Ct. 957, 44 L.Ed. 1108; Globe & Rutgers Fire Ins. Co. v. Rose, 8 Cir., 1937, 91 F.2d 635, 638; Note, Unilateral Mistake as basis of bill in equity to rescind the contract, 59 A.L.R. 809.

The principle is applied when the mistake was known to the other party to the transaction. The Restatement puts it this way: "Where the transferee knows or suspects the mistake of the transferor, restitution is granted if, and only if, the fact as to which the mistake is made is one which is at the basis of the transaction (see Comment c on

#16), unless there is a special relation between the parties (see Comment b·on #8)." Restatement, Restitution, Sec. 12(c).

In the application of this rule, two situations are envisaged. A person looking at jewelry in a store discovers a valuable jewel which has been placed with the "paste". He purchases it for a price wholly unrelated to its real value. Rescission and restitution are allowed, because the buyer knew that the seller did not intend to deal with the item at all. Restatement, Restitution, Sec. 12, Illus. 8.[3] The other illustration is where, although the object was of great value, neither side knew that fact. The finder of a stone, thinking it was a topaz, sold it for an insignificant sum to a jeweler who also thought it was a topaz. Although it developed later that it was actually an uncut diamond of very substantial value, no rescission was allowed, because both sides thought of, and intended to deal with reference to a cheaper object. Wood v. Boynton, 1889, 64 Wis. 265, 25 N.W. 42, 54 Am.Rep. 610. See Grymes v. Sanders et al., 1876, 93 U.S. 55, 63, 23 L.Ed. 798; Geremia v. Boyarsky, 1928, 107 Conn. 387, 140 A. 749, 750; Hardman Lumber Co. v. Keystone Mfg. Co., 1920, 86 W.Va. 404, 103 S.E. 282; Lange v. United States, 4 Cir., 1941, 120 F.2d 886.

At first glance, there would seem to be little, if any, logical basis for the divergent rulings. For, in both instances, there was shocking disparity between the price paid and the value of the article. But an analysis of the reasoning shows that the distinction between the two instances is this: While there was mistake as to price in both instances, in the case in which relief was granted, the mistake of price was coupled with, and resulted from, a mistake as to the *identity* of the goods with which the parties were dealing. Restatement, Restitution, Sec. 12(c), Illus. 9; 1 Williston on Contracts, Revised Ed., 1937, Sec. 94, p. 294.[4]

*(B) The Disparity as to Value.*

The claimed mistake here relates to the value of the universal gear joints. The trial court found that there was "no substantial evidence to establish their value at the time of the sale." It also found that their value was substantial, but that the "exact value" was "questionable and speculative", and that all these facts were known to both parties. (Finding III, already quoted.)

The value of personal property may be proved by evidence of its market value in the vicinity, given by those familiar with it. 3 Wigmore on Evidence, 3rd Ed., 1940, Secs. 716-720. Cost price *may be*

---

[3] The reverse of the situation arose in Smith v. Zimbalist, 1934, 2 Cal.App.2d 324, 38 P.2d 170. There, the court inferred a warranty of the value of goods sold (violins) from their description by the seller as genuine Guarnerius and Stradivarius, and rescinded the agreement of sale at the behest of the buyer, a noted violinist, when it was discovered they were not originals but copies.

[4] In compromise agreements, this court and other federal courts of appeal have recognized the right to relief when the mistake was on one side only: See, Marks v. Gates, 9 Cir., 1907, 154 F. 481, 14 L.R.A.,N.S., 317, 12 Ann.Cas. 120; Armour & Co. v. Renaker et al., 6 Cir., 1913, 202 F. 901; Chicago, M., St. P. & P. R. Co. v. Busby, 9 Cir., 1930, 41 F.2d 617, 618–619; Ricketts v. Pennsylvania R. Co., 2 Cir., 1946, 153 F.2d 757, 164 A. L.R. 387. (The concurring opinion of Judge Jerome N. Frank in this case contains, in the notes and text, an historical consideration of the conflicting views on recognizing unilateral mistake as a

ground for relief.) See, also, State of Connecticut v. F. H. McGraw & Co., D. C.Conn.1941, 41 F.Supp. 369, where the court follows Geremia v. Boyarsky, supra. And on the subject generally, 9 Wigmore on Evidence, 1940, Sec. 2416. For recognition of gross inadequacy of consideration as a ground for relief, see Robert Hind, Ltd. v. Silva, 9 Cir., 1935, 75 F.2d 74; Weeks v. Pratt, 5 Cir., 1930, 43 F.2d 53. Judge Frank would class these instances as "palpable" mistakes. See also, Hume v. United States, 1889, 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393. Williston has criticized the cases which grant relief for one-sided mistake: "It is obvious that a doctrine which permits the rescission of a contract on account of unilateral mistake approaches nearly to a contradiction of the objective theory of mutual assent in the formation of contracts to which the modern law seems generally to have tended." 5 Williston on Contracts, Revised Ed., 1937, Sec. 1579, p. 4412.

proof of value. 31 C.J.S., Evidence, § 183. Here, the Government did not offer any direct evidence of market value. However, several of its witnesses testified to the cost of the equipment, and, as the owner's representatives, they were entitled to give such opinion. See, Travelers Indemnity Co. v. Plymouth Box & Panel Co., 4 Cir., 1938, 99 F.2d 218, 223. And, even in a situation which called for the application of strict valuation principles, this testimony *could not be disregarded.* But here, value is not the primary consideration. The Government presses the great difference between agreed price and value as an indication of mistake of its selling agents as to the nature and identity of the goods.

Even if the testimony of the Government's witnesses were eliminated, there would still remain Jones' testimony and admissions, which, to our mind, indicate that *he knew,* and the Government's selling agent *did not know,* that (1) the universal gear joints were marine equipment, and (2) that they had great value, even as scrap. To particularize:

In his Answer to the Amended Complaint, Jones admitted that when the gears were manufactured, they had a retail value of $62,533.45, and a scrap value of $2,260.00, and alleged that *"he was at that time familiar with the nature and value of the gears."* The gears were 90 per cent or more brass and were quite heavy. Jones, who had worked in the shipyards where he had installed such equipment, admitted, at the trial, that he knew these facts, as he also knew that it was marine and not automotive equipment. In his amended Complaint filed on December 26, 1947, in an action for replevin brought in the Circuit Court of the State of Oregon for Multnomah County, against Mudge and D. M. Gibson, he alleged that the gears were worth $39,798.00. He testified, at the trial, that he was first offered the property for between $900 and $1,000, later for $250 and finally for $75. He was asked:

"Did you know then what these joints were?"

He answered:

"Well, only in a speculative value . . . I knew they were worth—that they prob-

ably cost the Government considerable more than what they were selling for, but that didn't mean to me what they were worth to me * * *"

The questioning continued:

"Q. Did you think you would be able to sell these goods for anything other than scrap? A. Well, I didn't know at the time what the present demand was. That was what limited whether I could sell them or not.

Q. Yes. A. If there was no demand, I had to sell them for scrap."

He testified that D. M. Gibson, in charge of the Oregon Shipbuilding Corporation Yard, told him that the gears had a scrap value of $2,250, and cost the Government around $66,000.00. He admitted that he told Zanon that he had bought $60,000 worth of gears, but said that his statement was based on Gibson's information. The following questions and answers appear further on in his examination:

"Q. At that time you told us that you had full knowledge of the use of these gears, the value, and that you worked in a shipyard, and that is how come you knew, and that is what you said in our office, did you not, in my office? A. I agree that I knew what their use was, yes.

"Q. And the reason you knew was you had been in a shipyard? A. That is right.

"Q. You had seen them and used them? A. I installed them, yes, but I knew that they weren't manufactured very cheaply because of their nature."

Jones had a catalog from M. & M. Machinery Supply of Camden, N. J., from which he learned what the gears would cost anyone other than the Government.

It is quite evident from these admissions that Jones *knew* the nature and value of the equipment, and that the agents of the Government, with whom he was dealing, and who executed the sales documents *did not.* They thought it was automotive equipment. Jones did not set them right. He did not tell them that he had worked in the shipyards, or that the gears were practically all bronze, or that they were marine equipment. For the reason, in his own words, *"there was no reason to*

*tell them that I knew they had a lot of bronze on them"*. Giving full scope to the right of the trial judge to assay the evidence, Grace Bros. v. Commissioner, 9 Cir., 1949, 173 F.2d 170, the Government was entitled to the full benefit of these admissions by their adversary, Jones. See, Pennsylvania R. Co. v. Chamberlain, 1933, 288 U.S. 333, 338–340, 53 S.Ct. 391, 77 L.Ed. 819; United States v. United States Gypsum Co., 1948, 333 U.S. 364, 394–395, 68 S.Ct. 525, 92 L.Ed. 746; National Labor Relations Board v. McGough Bakeries Corp., 5 Cir., 1946, 153 F.2d 420, 424–425; Twentieth Century-Fox Film Corp. v. Dieckhaus, 8 Cir., 1946, 153 F.2d 893, 899–900; Foran v. Commissioner, 5 Cir., 1948, 165 F.2d 705. They were uncontradicted by the other facts in the record. More, they were consistent with them. And they commanded the conclusion that there *was* a "mistake of identity of object" known to Jones, which resulted in an inequitable difference between the price paid and the actual value, and which called for rescission. Chesapeake & Ohio Ry. Co. v. Martin, 1931, 283 U.S. 209, 216–220, 51 S.Ct. 453, 75 L.Ed. 983; Pence v. United States, 1942, 316 U.S. 332, 338–340, 62 S.Ct. 1080, 86 L.Ed. 1510.

### IV. The Conclusiveness of the Instruments of Sale

What precedes would warrant the conclusion that, while the findings of the trial court on the question of authority are secure, in view of the contradictory character of the evidence on the subject, there was the type of unilateral mistake which our courts have recognized as grounds for rescission. Nonetheless, a reversal of the judgment is not called for. This for the reason that we are of the view that, *absent actionable fraud,* the War Surplus Property Act of 1944, 50 U.S.C.A. Appendix, § 1611 et seq., has made the sale to Jones immune against an attack grounded on lack of authority or mistake.

Section 25 of the Act reads: "A deed, bill of sale, lease, or other instrument executed by or on behalf of any Government agency purporting to transfer title or any other interest in property under this Act (sections 1611–1646 of this Appendix) shall be conclusive evidence of compliance with the provisions of this Act (such sections) insofar as title or other interest of any bona fide purchasers for value, or lessees, as the case may be, is concerned." 50 U.S.C.A.Appendix, § 1634.

Much has been written about the meaning of presumptions. But at the present time, the consensus is that conclusive presumptions do not establish a rule of evidence, *but declare a rule of substantive law.* Wigmore writes: "In strictness, there cannot be such a thing as a 'conclusive presumption'. Wherever from one fact another is said to be conclusively presumed, in the sense that the opponent is absolutely precluded from showing by any evidence that the second fact does not exist, the rule is really providing that, where the first fact is shown to exist, the second fact's existence is wholly immaterial for the purpose of the proponent's case; and to provide this is to make a rule of substantive law, and not a rule apportioning the burden of persuading as to certain propositions or varying the duty of coming forward with evidence". 9 Wigmore on Evidence, 3rd Ed., 1940, Sec. 2492, p. 292.

The books are full of instances in which legislative bodies have given finality to official acts. 4 Wigmore on Evidence, 1940, 3rd Ed., Secs. 1347–1357; See, Switchmen's Union v. National Mediation Board, 1943, 320 U.S. 297, 303–307, 64 S.Ct. 95, 88 L.Ed. 61. When such statutes affect adversely the rights of private persons, the question may arise whether a presumption was created which had no reasonable basis. And courts may be called upon, under the due process clauses of the Fifth or Fourteenth Amendments, to question its validity. See, Schlesinger v. Wisconsin, 1926, 270 U.S. 230, 239, 46 S.Ct. 260, 70 L.Ed. 557, 43 A.L.R. 1224; Heiner v. Donnan, 1932, 285 U.S. 312, 324–326, 52 S.Ct. 358, 76 L.Ed. 772; City of New Port Richey v. Fidelity & Deposit Co. of Maryland, 5 Cir., 1939, 105 F.2d 348, 351, 123 A.L.R. 1352. But where, as here, the Government deals with its own property, and declares certain memorials of official acts to be "conclusive evidence of com-

pliance with the Act", there is evidenced the intent to insure the title of the purchaser for value or of the lessee against any absence of authority preceding the execution of the memorials. See, United States v. Winona and St. Peter R. Co., 1897, 165 U.S. 463, 481, 17 S.Ct. 368, 41 L.Ed. 789.

The Government sees in the use of the word "agency" in this and in other sections of the Act, 1619(a), 1624, an intention to limit the protection of the purchaser for value or lessee to cases of lack of authority *in the agency and not in the persons acting for it*. And there is pressed upon us the argument that the real object of this and similar sections was to protect against the contention that the agency from which the purchaser derived title did not have power to *dispose* of it, because the property *belonged* to another agency. A study of the statute compels a contrary conclusion. This is not a casual statute, enacted in haste to cover an unexpected situation. The statute became effective on October 3, 1944, at a time when the tide of the War was turning. The Congress anticipated that the early end of hostilities would find many Governmental agencies in possession of property intended "for war purposes and common defense", and which, no longer needed, would become surplus. They, therefore, devised a comprehensive scheme for disposing of the property in a most effective manner, and in conformity with their conception of the American way of life, which they set forth in twenty avowed aims, 50 U.S.C.A.Appendix, § 1611(a) to (t). The chief of these were: To facilitate the transition from war-time to peace-time economy (c) without encouraging monopolistic practices (d) and encouraging small business and individual farmers and returned servicemen to reintegrate themselves into the national economy by helping them to reestablish themselves in agricultural, business and professional enterprises (a), (f) and (o). In thirty-five comprehensive sections, which we need not epitomize, a most detailed system of dealing with surplus property by a specially-created Surplus Property Board was devised. And,

because the various agencies of the Government, in carrying on the war, could not, in their acquisition of property, be guided by ordinary peace-time considerations of economy or thrift, Cf. United States v. Bethlehem Steel Corp., 1942, 315 U.S. 289, 305–309, 62 S.Ct. 581, 86 L.Ed. 855, but, of necessity, had to anticipate unforeseen events,—the property of which they found themselves possessed at the time, was of unusual quantity and value. In seeking to dispose of it promptly, the Government sought to be fair with those who bought and gave them the guaranty that, once the negotiations for disposition of any of the property have been transmuted into a formal deed, lease or other instrument in writing, it was conclusive evidence of compliance with the provisions of the statute and of title. And they provided that the purchaser for value or lessee,—not, as is usually done in statutes of this character,—innocent third parties, into whose hands property may go, but *the very parties with whom the agencies dealt and to whom the instruments were made out*, should be protected if they paid value. No other condition was attached.

Jones is in this class. He paid value, the price asked. United States v. Des Moines River Nav. & R. Co., 1892, 142 U.S. 510, 530, 12 S.Ct. 308, 35 L.Ed. 1099. If, in the face of this, and in the absence of fraud or venality on the part of its agents, Hume v. United States, 1889, 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393, the Government could question the transaction, the aims of the statute would be thwarted. The statute contains no limitation. And, as limitations do not run against the Government, no title would ever be secure against the Government, no title would *ever* be secure against attack.

It is inconceivable that the Congress would have subjected the purchasers, its former soldiers and independent business men, to whom it gave preference as buyers, 50 U.S.C.A.Appendix, § 1611(c, f), to such danger, unlimited in time. Mark well. The Government was not aiming to drive hard bargains with the purchasers of this surplus property. It was not seeking to sell, at a profit, in competition with private

industry, or to break even. To use Hotspur's phrasing, the Government was not "in the way of bargain" caviling "on the ninth part of a hair". Rather, like him, in dealing with the property, the Government, in its largess, was willing to

"Give thrice so much * * *

To any well-deserving friend."

Shakespeare, 1 Henry IV, Act III, Sc. 1.

*Nowhere in the statement of objectives is recovery of cost or value mentioned as a basis for disposition.* And when it speaks of prices at all, it refers to "fair prices to the consumer". 50 U.S.C.A.-Appendix, § 1611(m). Rightly. For the chief aim was to use the surplus property in helping the country, as a whole, pass from a war economy to a peace economy with as little dislocation and as painlessly as possible. The Government could assist in the attainment of this object by standing behind its selling agents and giving finality to certain of their written instruments by which title to property passed. House Report No. 1757, (78th Congress, 2nd Session, p. 17) supports this conclusion. Speaking of the intent of the Conference Committee, the Report says: "Section 10(a) of the committee amendment authorizes any agency disposing of property under the act to do so, subject to the other provisions of the act, by sale, exchange, lease, transfer, or other disposition for cash, credit, other property or otherwise, with or without warranty, and upon such other terms and conditions as the agency deems proper. Section 10(d), (Section 25 of the final draft), makes any instrument, executed by or on behalf of an agency, purporting to transfer title to property under the act, conclusive evidence for compliance with the provisions of the act, insofar as the title of any bona fide purchasers is concerned. These two provisions are designed clearly to assure to purchasers that agencies selling property of the Government have full authority to do so, and that the purchaser's title cannot be invalidated because of any failure of a Government agency to comply with a requirement of the act. These enabling provisions clarify the law on the subject, and the committee considers them of major importance."

And the Congress could "assure to purchasers that agencies selling property of the Government have full authority to do so", only if it immunized also against the acts of the persons who acted or assumed to act for the agencies.

 "Agencies" are inanimate bodies. They act only through living beings who exercise or assume to exercise authority for them. The conclusiveness with which the Congress endowed these instruments thus covers any non-compliance by the agents of the Government with the provisions of the Act. And it embraces such acts of lack of authority or mistake as were alleged here as grounds for recission.

We are, therefore, of opinion that the Government cannot impeach the unrecallable conclusiveness of the sales memoranda and bills of sale given to Jones by persons acting for the Maritime Commission and the War Assets Administration, and did not show itself entitled to rescind the transaction, either wholly or partially.

The judgment is, therefore, affirmed.

STEPHENS, Circuit Judge, did not participate in the decision of this case.