**KERN COPTERS, INC., a corporation,
Appellant,**

v.

**ALLIED HELICOPTER SERVICE, INC.,
a corporation, Appellee.**

**No. 16578.**

United States Court of Appeals
Ninth Circuit.

April 19, 1960.

Borton, Petrini, Conron, Brown & Condley, Bakersfield, Cal., for appellant.

Wild, Christensen, Barnard & Wild, Fresno, Cal., for appellee.

Before HAMLEY, HAMLIN and JERTBERG, Circuit Judges.

HAMLIN, Circuit Judge.

On October 4, 1955, a helicopter owned and operated by the United States Army crashed in the jungle about 36 miles north of Coban, Guatemala. The Army retrieved certain parts of the helicopter, but made no effort to recover the remainder, which, by 1957, still lay in the jungle. During 1957 appellant and appellee were conducting helicopter operations in Guatemala, both knew of the crash, and both now claim title to the wreck. Appellant is a California corporation and appellee is a Delaware corporation. Jurisdiction in the District Court was based on 28 U.S.C.A. § 1332 and in this Court on 28 U.S.C.A. § 1291.

Appellant's claim is based on a contract with the Property Disposal Officer of the Caribbean Command, United States Army. The events leading to this contract may be briefly summarized. On February 14, 1957, appellant wrote the Congressman from its district, inquiring as to the proper procedure to obtain title to the helicopter. The Congressman replied on March 18, 1957, enclosing a letter from Lieutenant Colonel Peeples, who was serving in the Office of the Chief of Legislative Liaison. The Colonel's letter, dated March 15, 1957, was written in response to the Congressman's inquiry on behalf of appellant. This letter stated that "all parts which were economically salvageable" were removed soon after the crash and that the remaining parts

were subsequently "dropped from accountability records." The Colonel enclosed a copy of Army Regulation 755–10, which he said "details the procedure by which [appellant] may request title to the remaining portion of the wrecked machine."

On March 25, 1957, appellant wrote the Commanding General of the United States Army Caribbean, saying it desired to obtain title to the wreck and enclosing a check for $50 "to effect a bona fide sale." Appellant apparently did not receive an immediate reply to this letter, and on April 12 sent a follow-up telegram. On the same day appellant wrote the "Disposal Officer, U. S. Army Caribbean," concerning acquisition of the wreck. On April 16 appellant received a telegram from the Commanding General, United States Army Caribbean, which said:

> "Reference your message action being taken to expedite sale of wrecked helicopter. Necessary contract forms and title being forwarded separately for appropriate signature."

On April 23, 1957, Captain J. E. Hughes, a Property Disposal Officer, wrote appellant acknowledging receipt of the check for $50 "covering payment in full for the purchase of the remains of the helicopter * * *." He enclosed four copies of a contract or bill of sale which he requested appellant to sign and return. Appellant executed and returned the documents as requested, after which Captain Hughes signed and returned a copy of the bill of sale to appellant, together with a letter stating that "finalization of the disposal of the helicopter * *. * has now been accomplished and you have been successful in obtaining the award of same * * *." This transaction is the basis of appellant's claim to title. Appellee's claim is based on events occurring during the course of these negotiations.

On April 1, 1957, some eighteen months after the crash, the wreck was recovered from the jungle by James Dula, an employee of appellee, who removed all remaining portions, excepting the rotor blades, to Camp Sohio, Guatemala. Dula claimed the helicopter for himself and instructed the manager of Camp Sohio not to let anyone else take possession. Agents of appellee later went to Camp Sohio to obtain possession, but the camp manager, on Dula's instructions, refused permission to remove it. In early June, 1957, appellant's general manager presented the bill of sale received from the Army to the camp manager and was permitted to remove the helicopter, which was shipped to the United States and its salvable parts used in repairing other helicopters. The dispute between Dula and appellee was apparently resolved against Dula in another action, and it is stipulated that as between Dula and appellee, Dula had no interest in the helicopter.

Appellee brought this action to recover possession or value of the helicopter. The District Court, finding that the Army had "abandoned" the wreck, concluded that appellee became its owner and entitled to possession on April 1, 1957, the date it was recovered from the jungle, and that appellant acquired no interest in the wreck by reason of the bill of sale. Judgment was granted to appellee for $7,000, which was found to be the value of the wreck at the time it was recovered.

During the period in question, Army Regulations 755–10, titled "Disposition of Foreign Excess Personal Property," were in effect. Army regulations have the force of law. Ex parte Reed, 1879, 100 U.S. 13, 22, 25 L.Ed. 538; Hironimus v. Durant, 4 Cir., 1948, 168 F.2d 288; United States v. Harleysville Mutual Casualty Company, D.C.Md.1957, 150 F.Supp. 326. A copy of these regulations was furnished by Colonel Peeples and forwarded to appellant by the Congressman. The regulations are based on the Federal Property and Administrative Services Act of 1949 (Title IV, 63 Stat. 397, 40 U.S.C.A. § 511 et seq.), and their declared purpose is to "prescribe procedures to be followed in the classification of personal property as foreign excess personal property, and for the dis-

posal of such foreign excess personal property * * *." Paragraph 1, AR 755–10. Paragraph 5 defines a number of terms:

"* * * d. *Disposal (also disposition)*.—The act of getting rid of excess or surplus property (including scrap and salvage) under proper authority. Disposal may be accomplished by, but is not limited to, transfer, donation, sale, abandonment, or destruction * * *.

* * * * * *

"*h. Property*.—As used in these regulations the term "property" always refers to personal property.

* * * * * *

"(6) *Excess personal property*.— Personal property under the control of any Federal agency (e. g., Department of Defense) which is not required for its needs or responsibilities.

"(7) *Foreign excess personal property*.—Excess personal property located outside continental United States, Hawaii, Alaska, Puerto Rico, and the Virgin Islands.

* * * * * *

"*i. Property disposal officer*.— The individual at an installation charged with the receipt, care, and authorized disposal of personal property. He is in charge of all salvage and disposal activities at the installation and formerly was known as the 'salvage officer.'

* * * * * *

"*k. Salvage (salvage property)*. —Property that has some value in excess of its basic material content but which is in such condition that it has no reasonable prospect of use for any purpose as a unit (either by the holding or any other Federal agency) and its repair or rehabilitation for use as a unit (either by the holding or any other Federal agency) is clearly impracticable.

"*l. Scrap*.—Property that has no value except for its basic material content, and includes waste. * * *"

The definitions of "excess property" and "foreign excess property" are substantially the same as those in 40 U.S.C.A. § 472(e) (f). Under the regulations scrap, salvage, and uneconomically repairable property is to be considered as foreign excess property. Paragraph 15, AR 755–10. Paragraph 22 provides:

"Foreign excess property will be disposed of by property disposal officers in accordance with these regulations by—

a. Transfer to other Federal Agencies;

b. Sale; or

c. Donation, abandonment, or destruction."

 Appellee suggests that the regulations are not applicable in that the property was lost in the jungle and thus not "under the control" of any Federal agency. However, the helicopter was not "lost" in the sense that its location was unknown. The general location was marked on all the Army's operational maps and there was testimony that appellant and appellee were briefed on its location. Secondly, although the Army did not have immediate physical possession of the wreck it was under the Army's "control" in that the Army had the power or authority to manage and administer the property as against either appellant or appellee. Black's Law Dictionary 399 (4th Ed.1957).

We hold the wreck was "foreign excess property" as that term is used in the statute and regulation.

Paragraph 28 of the regulation governs sales of foreign excess property, and there is no contention that all applicable provisions were not followed in the sale to appellant.

Abandonment, destruction and donation of property is covered in Paragraph 29(a) (b). Paragraph 29(a) permits abandonment without public notice upon a finding by a responsible officer, approved by a board of one or more officers,

that the abandonment is required by military necessity or by considerations of health, safety, or security, or the value of the property is so little or the cost of its care and handling is so great, that retention for thirty days is not justified. The record is devoid of evidence of compliance with this paragraph. Likewise, there is no evidence of disposition pursuant to paragraph 29(b), which permits abandonment not less than thirty days after giving wide public notice of proposed abandonment.

Notwithstanding the absence of any direct evidence of abandonment of the wreck by the Army pursuant to AR 755–10, the District Court found the Army "abandoned" the property on April 1, 1957. In an oral opinion the Court, taking note of statements by Army officers that the wreck had been "abandoned" and "dropped from accountability records," stated the key to his decision was a presumption that the responsible officers of the Army had done their duty and that the acts necessary to effect an abandonment under AR 755–10 had been done.

In support of the finding of abandonment appellee relies heavily on Colonel Peeples' letter of March 15, 1957, in which he said the remains had been "dropped from accountability records." This statement, according to appellee, shows the helicopter was no longer the property of the Army and the finding of abandonment follows from the fact that it had been dropped from accountability records.

It is apparent from the letter itself that "dropping from accountability records" is not equivalent to "abandonment," for in addition to stating the wreck had been dropped from accountability records the Colonel enclosed a copy of AR 755–10, which he said "details the procedure by which [appellant] may request title to the remaining portions of the wrecked machine." If the property had been "abandoned" and title thereto could be secured simply by taking it, the regulations would have been inapplicable and it is unreasonable to sup-

pose the Colonel would have suggested that a party interested in the wreck follow the procedure specified in the regulations to obtain title.

Although neither party offered evidence specifically directed to the meaning of "accountability," it was mentioned in the deposition of Captain John Bergner, which was read in evidence. Captain Bergner first went to Guatemala in 1956, and in April, 1957, was a member of the Caribbean Army Command, assigned as Aviation Officer in Charge of the Aviation Detachment, Inter American Geodetic Survey, in Guatemala City. In that capacity the Captain was responsible for maintenance, supply, and operation of helicopters in support of the Geodetic Survey operation. He testified that another officer

"made an evaluation of the wreckage and determined that the aircraft was not economically recoverable and that the aircraft would be abandoned 'as is' 'where is' and we were so instructed to turn in the aircraft forms and records from our organization to his and to clear our books of any accountability for the aircraft.

"Q. Do you recall when it was that the copter was written off the books? A. I would say certainly within a 30-day period after the accident. That accountability had to be made with a Report of Survey for the damages according to Army Regulations or the ship had to be turned in on paper in order to clear our accounts in order to draw a new helicopter to replace the one damaged or lost."

It may be concluded that the term "accountability" relates to administrative responsibility for property within the Army itself. Dropping from accountability may be a prelude to abandonment or other disposition by the Army, but procedures relating to management and control of property *within* the Army have no necessary relation to abandonment or other disposition *by* the

Army. A particular individual may be charged with responsibility for property, and thus accountable for it. If the property is damaged and the accountable individual is allowed to clear his books of accountability it does not follow that the Army has abandoned its claim to the remains.

Captain Bergner's statement that the property had been abandoned was based on information he received from someone else. He was not a Property Disposal Officer and admittedly had no authority to transfer or abandon the wreck. There is nothing to show his informant had any such authority. Captain Bergner knew that Captain Hughes, the officer with whom appellant contracted, was a Property Disposal Officer, and knew of no other Property Disposal Officer in the Caribbean Command.

■ Around the time the wreck was recovered, Captain Bergner, for the sole purpose of assisting Dula in satisfying Guatemalan Customs, provided him with a "certificate" stating the helicopter was abandoned "as is, where is" in October, 1955. Captain Bergner did not intend to thereby transfer title, and as he had no authority to relinquish title appellee can claim nothing by this certificate or any other declaration by Captain Bergner that the property had been abandoned. Royal Indemnity Co. v. United States, 1941, 313 U.S. 289, 294, 61 S.Ct. 995, 85 L.Ed. 1361; United States v. Jones, 9 Cir., 1949, 176 F.2d 278, 281.

■■ The Army's failure to seek to recover the remains for eighteen months does not constitute an abandonment. Congress has the power to provide for the disposition of property of the United States, Ashwander v. Tennessee Valley Authority, 1936, 297 U.S. 288, 330, 56 S.Ct. 466, 80 L.Ed. 688 and the power must be exercised by the authorized authority, United States v. State of California, 1947, 332 U.S. 19, 40, 67 S.Ct. 1658, 91 L.Ed. 1889, and in the authorized manner, Finsky v. Union Carbide & Carbon Corp., 7 Cir., 1957, 249 F.2d 449, 457, which in this case is pursuant to

AR 755–10. There is no affirmative evidence of abandonment pursuant to the regulation. "Inactivity, or neglect, upon the part of Government officers is insufficient to cause the Government to lose its property." United States ex rel. Tennessee Valley Authority v. Caylor, D.C.E.D.Tenn.1958, 159 F.Supp. 410, 413.

■ Nor can judgment for appellee be predicated on a presumption of abandonment. Underlying the claim of presumed abandonment is an assertion that the Army had a duty to act promptly (40 U.S.C.A. § 483(b) and either recover the wreck or abandon it. As no effort was made to recover the property, appellee's argument runs, a presumption that Army officers do their duty comes into play, and it thus follows that it was abandoned. But whatever vitality such a presumption might have in the absence of evidence to the contrary, it is overcome by indications by the Commanding General, U. S. Army Caribbean, that the property was for sale, and its sale to appellant by the person authorized, the Property Disposal Officer.

■ Presumptions, like swords, sometimes cut two ways. If appellee can claim presumptive abandonment, appellant can claim presumptive validity of his bill of sale: "presumption of legality attaches to the act of a public officer." United States v. Jones, 9 Cir., 1949, 176 F.2d 278, 282. If the Army had a duty to abandon the property it also had a duty not to subsequently sell it. As the Army did sell the wreck, it cannot be presumed it was abandoned.

■ We hold the Army did not abandon the wreck on April 1, 1957, or at any other time, and that appellee did not become the owner by taking possession.

Appellee next argues that even if it did not become the owner of the wreck, that as against appellant it held a superior right to possession. This claim is based on the theory that appellant's bill of sale is invalid and appellant is thus answerable as a converter.

On April 15, 1957, appellant's general manager was in Guatemala. On that

**314**

date he learned that the wreck, excepting the rotor blades, had been removed from the jungle and was located at Camp Sohio. This was not disclosed to the Property Disposal Officer, who apparently remained unaware of the removal. Appellee asserts that appellant's failure to inform the Army of the recovery of the wreck constituted a fraud on the United States and invalidates the bill of sale.

 We do not think appellant is chargeable with fraud. The day after appellant's general manager, who was in Guatemala, learned of the removal, appellant's Bakersfield, California, office received a telegram from the Commanding General of the United States Army Caribbean stating action was being taken "to expedite sale of wrecked helicopter." This telegram was in reply to a cable sent from Bakersfield on April 12, three days before appellant learned of the removal. Appellant made no subsequent representation respecting location of the helicopter; it was merely silent. There was no "fraudulent trick, scheme, or device." 40 U.S.C.A. § 489(b). Although the Property Disposal Officer perhaps did not know of the removal, he could have found out through Captain Bergner, who, as Officer in Charge of the Aviation Detachment to which the helicopter had been assigned, would have been the logical one to contact. In these circumstances there was no fraud. See 23 Am.Jur. 850 (Fraud and Deceit § 76 et seq.); Prosser on Torts 532 (Misrepresentation § 87).

 Appellee lastly argues that the bill of sale, even if valid, does not purport to convey the property in question. The bill of sale sets forth the "Description and Location of Property" as follows:

> "Remains of the H–13E Helicopter, Ser #51–14104, located approximately 36 miles north of Coban, Guatemala, no guaranty can be made of any salvage remaining. All titles and rights contained in herein described property are transferred in place to the purchaser under this contract."

Appellee contends that the bill of sale conveyed only so much of the helicopter as remained at the scene of the crash, that is, the rotor blades, the sole "Remains * * * located approximately 36 miles north of Coban * * *." However, we think that reference to location of the helicopter was intended only to identify the helicopter which was the subject of the contract, and not to restrict the transfer just to those portions of the wreck which were still located at the scene of the crash. Although the Army made no guaranty that any salvage remained, the language used was appropriate to convey whatever rights it had in the wreck, regardless of location.

Reversed and remanded with directions to enter judgment for appellant.